# United States Court of Appeals
## For the First Circuit

No. 12-1743

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID GONZÁLEZ-PÉREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Ripple,* Circuit Judges.

Tina Schneider, for appellant.
María A. Domínguez-Victoriano, First Assistant United States
Attorney, with whom Rosa Emilia Rodríquez-Vélez, United States
Attorney, Nelson Pérez-Sosa, Assistant United States Attorney,
Chief, Appellate Division, and Jacqueline D. Novas-Debien,
Assistant United States Attorney, were on brief, for appellee.

January 23, 2015

---

* Of the Seventh Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendant David González-Pérez ("González"), a former officer with the Puerto Rico Police Department ("PRPD"), was charged with drug and gun charges for his participation in fifteen drug transactions that were part of an FBI sting operation aimed at corrupt police officers. After an eleven-day trial, the jury acquitted González of all charges arising out of the first drug transaction, as well as all firearm charges, but convicted him on all other counts. González now appeals, arguing that the district court erred by declining to give jury instructions on entrapment, duress, and impeachment by prior conviction, and by failing to prevent other trial errors at closing arguments. Finding no reversible error, we affirm.

## I. Facts

Aiming to combat corruption in the PRPD, in 2008 the Federal Bureau of Investigation ("FBI") launched a sting operation called "Operation Guard Shack," which has been described in detail in other cases arising out of the same operation. See United States v. Díaz-Castro, 752 F.3d 101 (1st Cir. 2014); United States v. Delgado-Marrero, 744 F.3d 167 (1st Cir. 2014); United States v. Díaz-Maldonado, 727 F.3d 130 (1st Cir. 2013). The FBI hired confidential informants to invite police officers, suspected to be corrupt, to provide armed protection for drug transactions staged and secretly recorded by the FBI. Police officers providing armed

protection for these drug transactions were usually paid between $2,000 and $2,500 per transaction.

The FBI's main confidential informant in this case was Héctor Cotto-Rivera ("Cotto"), a former PRPD officer. González and Cotto had met and worked together at the PRPD. In early 2008, while still working as police officers with the PRPD, González and Cotto were charged at the state level for taking a bribe from an arrestee to fix his case.[1] As a result of these criminal charges, they were both initially suspended and then terminated from their employment with the PRPD. Both Cotto and González pled guilty to omission in the fulfillment of their duties.

Cotto also faced federal charges for taking bribes. Seeking leniency on the federal charges, Cotto became a confidential informant for the FBI. He portrayed himself as a drug dealer and was tasked with identifying corrupt police officers. Cotto testified at trial that, since he already knew that González was a corrupt officer, he approached González and asked him to sell Cotto drugs. González, however, did not do so. Cotto testified that, on other occasions, González approached Cotto asking him for work in his purported drug businesses, but that Cotto did not offer

---

[1] According to Cotto, González, who had arrested a person for drugs and firearms, asked Cotto to be a middleman and receive $8,000 from the arrestee in exchange for González's dismissal of the charges. Cotto accepted González's proposal and received $8,000 from the arrestee. Cotto testified that he and González split the money evenly.

him any job, supposedly because at the time they still had the state bribery charges pending.

Sometime later, Cotto became involved in Operation Guard Shack, where he played the role of the right-hand man for a drug trafficker and was tasked with identifying and inviting corrupt police offers to provide armed protection for the drug transactions. The plan was to require each police officer recruited to, in turn, recruit another corrupt police officer, so that the FBI could identify additional corrupt officers. Cotto approached police officers whom he already thought were corrupt, including González.

On or about September 9, 2009, Cotto telephoned González to tell him for the first time about an armed security job that he had available for the following day. Cotto told González that the job would pay $2,000. González, who was aware that the work being offered was not legal,[2] responded: "Okay. If you're gonna pay me, yes. If you're gonna take me for a fool, no." After Cotto reassured him that the job indeed paid $2,000, González enlisted for the job. Details of the transaction were not discussed over the phone, because González was reluctant to do so.[3] Cotto did,

---

[2] Although González claims that the word "drugs" was never mentioned during the telephone conversation, he admitted that he knew the job must have been illegal because of the high pay being offered.

[3] During the telephone conversation Cotto asked González: "You want me to give you details, or not?" González responded: "Well --

-4-

however, tell González that he needed to wear a bulletproof vest, take a firearm with him, and bring another police officer to also provide armed security. González agreed to wearing a bulletproof vest but said he was unable to get a firearm or enlist someone else for the job. Cotto told González not to worry about the firearm, and reached out to a correction officer with whom he was acquainted because a third person who could be trusted was allegedly needed for the security detail. Cotto and González then discussed the details about how González was to get to the apartment where the security would be provided.

As planned, on September 10, 2009, González met with Cotto at the Plaza Las Américas shopping mall, where they were joined by Christian Díaz-Maldonado ("Díaz"), the correction officer recruited by Cotto.[4] They all drove together to an apartment in Isla Verde, Puerto Rico, where the security would be provided. This apartment had concealed audio and recording devices.

While waiting for the drug buyer at the apartment, González drank beer and casually chatted with Cotto, Díaz, and the purported drug trafficker, Eddie.[5] After the drug buyer arrived,

---

no, I don't know if over the phone . . . ."

[4] Díaz was charged and convicted in a separate case for his participation in Operation Guard Shack. He appealed his conviction and sentence, both of which were affirmed by this court. See Díaz-Maldonado, 727 F.3d 130.

[5] Eddie was really an undercover special agent in the FBI's New York office.

-5-

González frisked the buyer for concealed weapons and recording devices. Eddie then brought out a piece of luggage and removed bricks of fake cocaine from it. The buyer examined the bricks.

Upon the conclusion of the drug transaction, González and Díaz escorted the buyer to the exit and returned to Cotto, who then paid $2,000 to each González and Díaz. González took the money without hesitation, counted it, and placed it in his pocket. As he was getting ready to leave the apartment, González told Eddie, "we are at your service."

After the September 10 transaction, González participated in fourteen additional drug transactions. He was paid either $2,000 or $2,500 for his participation in each of them. For these subsequent transactions, González carried firearms. He also recruited additional people to provide armed security for these transactions, including his brother, his sister-in-law, his neighbor, and his barber. These subsequent transactions had the same modus operandi as the one that took place on September 10, 2009. Most of these transactions were preceded by recorded telephone conversations between González and Cotto, during which they discussed whether González had recruited others to assist in the transactions, their names, and whether González had explained to those recruited what was expected of them during the transactions. González manifested his gratitude for being offered these additional work opportunities, reiterated that he was at

Eddie's service and indicated his willingness to engage in other illegal activities, such as buying illegal firearms and coordinating drug smuggling ventures for Eddie. González's last transaction took place on March 16, 2010. He was arrested in September 2010.

In August 2011, González was tried alone before a jury on sixty-three counts contained in a second superseding indictment. The charges included multiple counts of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II), 846; aiding and abetting an attempt to possess with intent to distribute cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II), 846; 18 U.S.C. § 2; possession of a firearm in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A); and aiding and abetting possession of a firearm in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A); id. § 2.

At trial, González admitted his participation in the drug transactions, but claimed that he was carrying blank firearms. He also claimed that when he agreed to participate in the initial transaction, he did not know that it would involve drugs and that it was not until the bricks of cocaine were pulled out of the luggage in the middle of the first transaction that he realized that he was in a drug transaction. González further claimed that Cotto took advantage of his financial situation, and that he continued participating in the transactions out of fear for his

safety and that of his family. Accordingly, González requested jury instructions on entrapment and duress. He also requested jury instructions on impeachment of witness by prior conviction. The district court denied his request.

Following an eleven-day trial, the jury acquitted González of all the firearm charges and of the drug charges arising out of the first drug transaction. González was convicted of the drug charges arising out of the fourteen subsequent drug transactions. He was sentenced at the lower end of his applicable Guidelines' sentencing range (i.e., 292 months of imprisonment), to be followed by a five-year term of supervised release. This appeal followed.

## II. Discussion of González's Claims

### A. Denial of Instruction on Entrapment Defense

González claims that he was entitled to a jury instruction on entrapment. He argues that there was enough evidence in the record to find both that the government induced him to commit the crimes by "forceful solicitation and dogged insistence," and that he otherwise lacked the predisposition to do so. Because González preserved his objection below, we review the district court's refusal to give an entrapment instruction de novo. United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012). In so doing, we examine the evidence in the light most favorable to González. Id. at 10.

-8-

The defense of entrapment has two elements: (1) government inducement of the criminal conduct; and (2) an absence of predisposition on the part of the defendant to engage in the criminal conduct. Díaz-Castro, 752 F.3d at 109; United States v. Panet-Collazo, 960 F.2d 256, 259 (1st Cir. 1992). Inducement requires not only giving the defendant the opportunity to commit the crime but also a "plus" factor of government overreaching. United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013) (internal quotation marks omitted). Examples of government conduct that may satisfy this "plus" factor include "excessive pressure, such as the use of intimidation, threats, or 'dogged insistence,' [and] 'taking advantage of an alternative, non-criminal type of motive.'" Id. (citations omitted). "Operations which merely give a defendant an opportunity to commit a crime, including sting operations, ordinarily do not constitute entrapment." Dávila-Nieves, 670 F.3d at 9.

In order to be entitled to an instruction on entrapment, the record must show "some hard evidence" of both government inducement and the defendant's lack of predisposition. Id. This evidence must be more than uncorroborated self-serving assertions. United States v. Shinderman, M.D., 515 F.3d 5, 14 (1st Cir. 2008). In assessing the sufficiency of this evidence, the district court may not weigh the evidence, make credibility determinations or resolve conflicts in the evidence. Dávila-Nieves, 670 F.3d at 10.

Rather, it must determine whether the evidence is enough, "if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his own accord." Panet-Collazo, 960 F.2d at 259.[6]

González claims that the government improperly induced him to commit the charged crimes because Cotto was a friend of his, knew of González's difficult financial situation, and called González several times, first asking to buy drugs from him, and then to offer him the armed security job. None of these circumstances amount to improper government inducement.

First, González cites no evidence indicating that Cotto solicited his participation by appealing directly to their friendship. United States v. Baltas, 236 F.3d 27, 37 (1st Cir. 2001) (rejecting "the proposition that friendship, without a plea predicated upon friendship, suffices legally as inducement" (quoting United States v. Young, 78 F.3d 758, 761 (1st Cir. 1996))).

Second, González cites no evidence indicating that his financial situation was such that he was at a particularly

---

[6]   We recently stated in Díaz-Maldonado that "the entrapment defense is a difficult defense to raise and prevail on." 727 F.3d at 139.  There, we affirmed the district court's refusal to charge the jury on entrapment and we noted that "[i]n twenty-two prior appeals to this circuit challenging a trial court's refusal to give a jury instruction on entrapment, we have overruled the refusal only three times."  Id. at 139-140.  Subsequently, in Díaz-Castro, we once again affirmed the district court's refusal to give an instruction on entrapment. 752 F.3d 101.

vulnerable point in his life.  All the record shows is that González had various part-time jobs, the last one ending the week preceding his first transaction, that he was receiving unemployment benefits, and that he thought that the high payment offered by Cotto would help him solve his financial situation.  This is not enough to constitute inducement.  See United States v. Díaz-Díaz, 433 F.3d 128, 136 (1st Cir. 2005) ("The promise of financial gain, however, even if significant, is insufficient to demonstrate government inducement."); Baltas, 236 F.3d at 37 (holding that merely presenting defendant with a plan to alleviate a "strangling financial situation" does not constitute inducement).

Third, González's bare assertion that Cotto called him several times and González declined previous invitations to commit offenses does not amount to inducement.  In analyzing whether there was improper inducement, the method of purportedly inducing a defendant is more important than the number of solicitations.  Accordingly, we have held that having an enthusiastic and persistent buyer does not amount to improper government inducement. United States v. Teleguz, 492 F.3d 80, 84 (1st Cir. 2007) ("[M]erely giving a defendant an opportunity to commit a crime when the government puts forth an enthusiastic and persistent buyer of illicit goods cannot be improper inducement."); United States v. Pratt, 913 F.2d 982, 989 (1st Cir. 1990) (rejecting defendant's contention that he was entitled to a jury instruction regarding

-11-

entrapment given evidence of multiple phone calls from the government agent, even coupled with defendant's failure to return phone calls and appear at scheduled meetings).

Here, there was no arm-twisting or undue coercive method employed. Although González claims that there was some resistance on his part before the first drug transaction and that it took several calls before all details were ironed out, the record shows that González's resistance had nothing to do with the idea of providing protection for the transaction,[7] but rather with the requirement of taking a firearm with him and of recruiting someone else to also provide armed security. The several telephone calls were made to straighten out the details, not to convince him to do the job. See United States v. Rogers, 102 F.3d 641, 646 (1st Cir. 1996) (rejecting defendant's claim that he was "targeted" because he "proved ready enough to enter into talks" and "[h]is only resistance was not to the idea of the crime, but rather to the risks and the terms"). In fact, González seemed so eager to avail himself of the opportunities to commit the crimes that he repeatedly told Eddie that he was "very grateful" and "at his service," and exclaimed "Oh wow! That's awesome, dude," upon learning of an additional opportunity to provide armed security.

---

[7] The first time that Cotto offered him a job providing armed security, González said that he would be happy to participate if Cotto would not "take [him] for a fool" and would actually pay him.

Moreover, additional evidence on the record undercuts González's claim of improper government inducement. The evidence showed that he associated with people connected to the drug world,[8] he never reported any alleged threat, he participated in fifteen separate transactions, and the videos of these transactions show that he "d[id]n't look anything like a person who's being entrapped." See United States v. Capelton, 350 F.3d 231, 243 (1st Cir. 2003) (emphasizing these same circumstances as indicators that there was no government inducement). In fact, he seemed so comfortable around Eddie, the drug dealer, that he drank beer with him, hugged him, and even invited his family and close friends, including his brother, sister-in-law, and his neighbor, to participate in the drug transactions. He also was comfortable enough to make demands from Cotto and even reproached Cotto for not answering his telephone call when González had been calling him all day to ask him whether there was more work.

Although González would have us consider only the evidence proffered by him, to the exclusion of other evidence in the case, when we assess the sufficiency of the evidence for an instruction on entrapment, we must consider all the evidence on record. Looking at all the evidence in the light most favorable to González, no reasonable juror could conclude that he was improperly

---

[8]  According to the evidence on record, while working as a police officer, González let a drug trafficker, who would potentially face drug and firearm charges, walk away in exchange for money.

-13-

induced by the government. Because we conclude that González did not carry his entry-level burden as to improper government inducement, the district court's refusal to charge the jury on entrapment was justified and we need not dwell on the evidence of predisposition. United States v. Ramos-Paulino, 488 F.3d 459, 462 n.1 (1st Cir. 2007) ("Given the disjunctive nature of the [entrapment] test, we can fulfill our appellate function . . . on either inducement or predisposition." (alteration in original) (quoting Capelton, 350 F.3d at 242-43)).

**B. Denial of Instruction on Duress Defense**

González claims that he was also entitled to a jury instruction on duress. "Duress is a common law defense that excuses criminal conduct if the defendant violated the law only because [he] was unlawfully threatened by another person with death or serious bodily injury." United States v. Vázquez, 724 F.3d 15, 27 (1st Cir. 2013). A duress defense requires proof that the defendant committed a crime as a result of: "(1) an immediate threat of serious bodily injury or death, (2) a well-grounded belief that the threat will be carried out, and (3) no reasonable opportunity to escape or otherwise to frustrate the threat." United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996); see also Díaz-Castro, 752 F.3d at 108.

In support of his duress defense, González points to his testimony that, because he was involved in a drug transaction and

-14-

he "was providing security for [ ] an important person" who "had control of everything" and who knew where González lived, González believed that his own life and the lives of his family members were in danger. It was implied, González claimed, that if anyone went to the police, Eddie would take care of them "in a violent way." Also, according to González, Cotto told him that González had to continue participating in the drug transactions.

The district court concluded that the record lacked evidence to support the duress defense and, thus, it declined González's requested instruction. Since González's objection was preserved below, we review de novo whether he made a threshold showing that the record evidence, construed in his favor, supported his requested instruction. Díaz-Castro, 752 F.3d at 108; United States v. Baird, 712 F.3d 623, 627 (1st Cir. 2013). Here, González has not made such a showing.

The alleged threat was not immediate, or even imminent. If a threat at all, "it was no more than a 'vague threat of future harm,' which is insufficient to support a duress instruction." Vázquez, 724 F.3d at 28 (quoting Arthurs, 73 F.3d at 450) (refusing to consider alleged threat of what gang-members "do to people [who] . . . snitch" as immediate or "imminent"). In addition, the alleged threat would be irrelevant to the crimes charged, as it was directed at those who would "go to the police," rather than to those who refused to provide armed security for drug transactions.

In analyzing duress, "the relevant threat is that which 'caused the actor to engage in conduct violating the literal terms of the criminal law.'" Id. (quoting United States v. Bailey, 444 U.S. 394, 409 (1980)). González faces drug charges, not charges for failing to report drug crimes. See Vázquez, 724 F.3d at 28 (rejecting a duress defense and concluding that because defendant was "charged with violating the laws criminalizing the sale of cocaine, not with failing to report those crimes," the threat against "snitches" was irrelevant).

Even accepting that González might have construed the alleged threat against those who would "go to the police" to be the equivalent of a threat of harm for not actively committing the drug crimes, "such a subjective belief would not constitute a 'well-grounded' fear." Id. (quoting United States v. Bello, 194 F.3d 18, 27 (1st Cir. 1999)). The evidence required is that of threats causing "a defendant of ordinary firmness and judgment" to believe that he would face immediate danger if he did not commit the criminal acts. Vázquez, 724 F.3d at 28 (citing United States v. Castro-Gómez, 360 F.3d 216, 219 (1st Cir. 2001)). The evidence in the record does not meet that standard. In fact, it shows the opposite. There is no evidence that González was threatened before making the initial choice to participate, when he already knew that he would be providing security for a "dangerous" and "powerful" person, who was involved in "something illegal." Then, after the

-16-

first transaction, González told Eddie that he was "at his service" and chose to return fourteen additional times, in which he showed excitement at the prospect of participating in additional transactions. In fact, he reproached Cotto for not picking up the phone when González had been trying to call him asking for additional work. González also took his close friends and family to participate in some of the transactions. Based on that evidence, a reasonable juror could not plausibly conclude that the defendant faced immediate danger if he did not commit the crimes charged.

In addition, the record is devoid of evidence suggesting that González lacked a reasonable opportunity to escape or otherwise frustrate the alleged threat against him. Vázquez, 724 F.3d at 28; Arthurs, 73 F.3d at 448. Instead, the record shows that he was enjoying himself, drinking beer, and hugging Eddie. See Díaz-Castro, 752 F.3d at 108-109 (rejecting defendant's claim that he was unable to withdraw because there was no record evidence of any effort to withdraw and the video showed defendant enjoying himself).

Furthermore, the duress defense is unavailable if the defendant placed himself in a situation in which it was probable that he would be subjected to duress. Id. at 109. Here, the record shows that González put himself in this situation not once,

but numerous times, by making himself available and "at Eddie's service."

In light of this, the evidence at trial, even when construed in González's favor, could not have supported a finding of duress. Therefore, the district court did not err in refusing to give an instruction on the duress defense.

## C. Denial of Instruction on Impeachment by Prior Conviction

González next claims that the district court committed reversible error when it failed to give his requested instruction concerning the impeachment of witnesses by prior conviction.

We review the district court's refusal to give this requested jury instruction under an abuse of discretion standard. United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008). The refusal to give a requested instruction constitutes a reversible error "only if the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." United States v. González-Soberal, 109 F.3d 64, 70 (1st Cir. 1997) (quoting United States v. Gibson, 726 F.2d 869, 874 (1st Cir. 1984)). Under the third requirement, "reversal is not required unless a defendant suffers substantial prejudice." De La Cruz, 514 F.3d at 139.

Here, González requested a jury instruction on impeachment of witnesses by prior conviction because government witnesses Cotto and Eusebio Hernández ("Hernández") both had prior felony convictions.[9] The government did not object to the instruction. The district court, however, denied the instruction because it understood that the instruction is warranted only if the witness denies the prior conviction. Since both Cotto and Hernández had admitted their prior convictions while testifying, the district court declined to give the requested instruction.

González is correct that the district court misunderstood the applicable law. Impeachment by prior conviction means that the witness's character for truthfulness may be attacked by evidence of certain criminal convictions. See Fed. R. Evid. 609(a). It does not require that the witness first deny the prior criminal conviction. Id. However, this does not amount to a reversible error in this case.

This circuit's pattern instruction on impeachment of witness testimony by prior conviction reads: "You have heard evidence that [witness] has been convicted of a crime. You may consider that evidence, together with other pertinent evidence, in deciding how much weight to give to that witness's testimony."

---

[9] Cotto's conviction related to the bribery incident when he was a police officer, while Hernández's conviction resulted from his own participation in the sham drug transactions with González.

Pattern Crim. Jury Instr. 1st Cir. § 2.03 (1998) (alteration in original).

The jury instruction provided by the district court included the following language:

> You have heard the testimony of Héctor Cotto and Eusebio Hernández, that they provided evidence under agreements with the government and or participated in the crime charged against the defendant and or received money from the government in exchange for providing information. Some people in this position are entirely truthful when testifying. Still you should **consider the testimony of these persons with particular caution**. You may consider they may have had reason to make up stories or exaggerate what others did because they wanted to help himself [<u>sic</u>]. You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice for or against the defendant, or by any of the benefits he has received. **You may consider their guilty pleas in assessing their credibility**, but you are not to consider their guilty pleas as evidence against this defendant in any way. (Emphasis added).

Although the instruction given by the district court did not contain the specific language sought by González, "there is no reversible error if the jury charge taken as a whole substantially covered the issues contained in the requested instruction." <u>United States</u> v. <u>Angiulo</u>, 897 F.2d 1169, 1207 (1st Cir. 1990). "The charge need not follow the exact form and wording of the defendant's proposed instructions." <u>González-Soberal</u>, 109 F.3d at 70 (internal quotations omitted).

-20-

We conclude that the instruction given to the jury substantially addressed issues of credibility with respect to both government witnesses. The fact that both Cotto and Hernández each had a prior felony conviction was elicited, and thus, the jury was aware of their criminal backgrounds. The district court then reminded the jury that the two witnesses had guilty pleas and had cooperation agreements with the government. It instructed the jury that they had the duty to determine credibility, that the jury should consider the testimony of these two witnesses with greater caution, and that they were to consider all the factors they deemed relevant in assessing their credibility, including the prior guilty pleas of both Cotto and Hernández. González has presented no evidence that would lead us to believe that the jury felt prevented from viewing the testimony of these two government witnesses with particular skepticism or greater caution. Therefore, we find no error in the instructions given. See González-Soberal, 109 F.3d at 71 (finding no error where the district court failed to give the impeachment by prior conviction instruction, because the instruction provided reminded the jury that the two witnesses had been convicted, that they had cooperation agreements with the government, and that the jury should view their testimony with greater caution).

## D.  Closing Arguments

### 1.  González's closing argument

González alleges that during his closing argument the district court made several unjustified sua sponte interruptions, and sustained various unfounded objections interposed by the government, which prevented him from making an effective closing argument and thus rendered the trial unfair.  Based on these alleged interruptions and objections, González moved for a new trial.  The district court denied González's motion under Federal Rules of Criminal Procedure Rule 33, finding that the court's interjections were warranted and that it had been correct in its rulings sustaining objections made during González's closing argument.  The court also found that even if error occurred, González had not been prejudiced by the court's interjections and rulings.  González appeals the denial of his motion for a new trial.

We review the denial of a Rule 33 motion for a new trial for "manifest abuse of discretion." United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012).  A new trial is granted "sparingly," and only where there would be "a miscarriage of justice and where the evidence preponderates heavily against the verdict." United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010) (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).  When determining the prejudicial effect of challenged acts, a court

should not grant a motion for a new trial where a process, although imperfect, adequately protected the defendant's rights. United States v. Glantz, 810 F.2d 316, 321 (1st Cir. 1987). Rather, the court must decide whether the alleged errors affected the defendant's substantial rights. United States v. Meserve, 271 F.3d 314, 332 (1st Cir. 2001). After all, "the Constitution entitles a criminal defendant to a fair trial, not a mistake-free trial." Id. (quoting United States v. Sepúlveda, 15 F.3d 1161, 1196 (1st Cir. 1993)).

In general, we have recognized that, "a judge is not a mere umpire; he is the governor of the trial for the purpose of assuring its proper conduct, and has a perfect right -- albeit a right that should be exercised with care -- to participate actively in the trial proper." United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008) (quoting Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997)) (quotation marks omitted). Trial judges also have "broad discretion over the scope of summations." United States v. Grabiec, 96 F.3d 549, 552 (1st Cir. 1996).

González alleges that, while defense counsel was "arguing that Cotto was unworthy of belief," the district court improperly interrupted him and stated: "Counsel, I assume that is your position, it will be for the jury to determine based on the evidence whether he lied or not." González claims that this statement by the court improperly "sent the message that his

-23-

position was not one shared by the court." We disagree. First, counsel should refrain from making statements that convey a personal opinion relating to a witness's credibility. See United States v. Auch, 187 F.3d 125, 131 (1st Cir. 1999); Grabiec, 96 F.3d at 550 (observing that the rule that counsel must not express a personal opinion, though generally applied to prosecutors, "applies both ways"). Second, the court's statement did not indicate, either explicitly or implicitly, that the court did not share defense counsel's position. Furthermore, even if the jury could have inferred anything from the court's statement, any prejudice from such inference would have been cured by the court's instruction to disregard its comments and admonishments to counsel. Specifically, the court gave the following instruction:

> Do not assume from anything that I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything that I may have said during the trial in arriving at your own findings as to the facts. . . . You are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial.

We assume the jury to have followed the court's instructions. See United States v. Rodríguez, 675 F.3d 48, 63 (1st Cir. 2012).

González also complains that when defense counsel intended to use transcripts to refresh a witness testimony to the jury, the district court interrupted him and said "I will request that you argue, the transcript is not in evidence." Although

González avers that the use of transcripts may ensure the accuracy of the recitation of a testimony, here, defense counsel was not merely reading from transcripts. Rather, he was also projecting the transcripts from the overhead projector and referencing them as evidence. Since these transcripts were not in evidence, we find no error in the court's interjection. See Herring v. New York, 422 U.S. 853, 862 (1975) (recognizing the broad discretion of the trial judge in closing arguments). We note that the court did not prevent defense counsel from arguing the content of the transcripts or otherwise getting his point across. Rather, it only instructed him not to refer to something as evidence that had not been admitted as such.

Next, González alleges that while defense counsel was arguing that the sting operation was "poorly planned" and that "out of 17 people, we have 15 or 16 who were mechanics, truck drivers," the court interrupted him and said that he was misquoting the evidence, that there was no "evidence for that amount of people" and that he should "stick to the evidence." There was no error. The evidence admitted at trial simply did not support defense counsel's contention. Faced with this misquoting of the evidence, it was within the district court's discretion to interrupt defense counsel's argument. See United States v. DiSanto, 86 F.3d 1238, 1248 (1st Cir. 1996) (noting that the district court is "best situated to make a battlefield assessment of the impact that a

particular piece of improper information may have on a jury" (quoting United States v. Rivera-Gómez, 67 F.3d 933, 998 (1st Cir. 1995))).

González also alleges that, while defense counsel was arguing about the timing for retrieving the firearms from his home, the district court improperly interrupted him and concluded that he was making reference to punishment and that there was an issue of jury nullification. The court's interruptions responded to defense counsel's reference to González having been in prison since October 2010, not being back home since his arrest, and not being back home for more than a year. Because the arguments were directed at the gun charges and the jury acquitted González of all such charges, we need not decide whether the district court's ruling on this matter was correct, as any error would be harmless. See United States v. Crochiere, 129 F.3d 233, 236 (1st Cir. 1997) (holding that the acquittal rendered the alleged error harmless).

González also challenges the court's interjections when defense counsel was arguing that the design of the sting operation was flawed. In making his point, defense counsel stated that the operation "attracted people simply down and out, and in need of money"; that those attracted were "simply poor and vulnerable"; and that the government should "go after the real drug traffickers, [that] this island is full of drug traffickers." The government objected to these statements and the court sustained the

objections.  There was no error.  Although jurors have the power to set an accused free for any reason or for no reason, their duty is to apply the law as given to them by the court.  United States v. Appolon, 695 F.3d 44, 65 (1st Cir. 2012).  "Neither the court nor counsel should encourage jurors to exercise their power to nullify."  Id. (quoting United States v. Bunchan, 626 F.3d 29, 34 (1st Cir. 2010)) (internal quotation marks omitted).  Here, by suggesting that there are worse people out there, and that the government should go after them and not after the poor and vulnerable, defense counsel was encouraging the jury to disregard the law and acquit González.  Thus, the statements were aimed at jury nullification and the government's objections were properly sustained.

We need not recount in detail the additional interjections and government objections about which González now complains.  For present purposes, it suffices to say that we have reviewed each of them in the context of the record as a whole.  They involved either defense counsel's attempt to instruct the jury as to legal issues, to argue the entrapment defense despite being precluded from doing so by a prior court order, defense counsel's opinion about the credibility of witnesses, or arguments specifically related to the gun charges for which González was acquitted.  Even if the court's ruling on these matters were

erroneous, they would be harmless. See Rodríguez, 675 F.3d at 61-62.

Additionally, as discussed supra, following closing arguments, the court explicitly instructed the jury that, in rendering its decision, it should not consider the court's comments and admonishments to counsel, nor the objections or arguments made by counsel.

Consequently, we conclude that González was not prejudiced by the trial court's rulings and interjections, nor was his right to a fair trial infringed upon. Thus, the district court did not manifestly abuse its discretion in denying González's motion for a new trial. See Merlino, 592 F.3d at 32.

### 2. The Government's rebuttal argument

Finally, González claims that the government made some improper remarks in its rebuttal argument which rendered the trial unfair. Where a timely objection was made, "[w]e review de novo whether the challenged portion of the government's closing argument was improper and, if so, whether it was harmful." Appolon, 695 F.3d at 66. The prosecutor's improper statements during closing argument are considered harmful if they "so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." Rodríguez, 675 F.3d at 62 (quoting United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007)); United States v. Garza, 435 F.3d 73, 77 (1st Cir. 2006) ("A non-constitutional evidentiary error is harmless . . . so long as it is highly probable that the

error did not influence the verdict." (quoting <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 56 (1st Cir. 2002)) (internal quotation marks omitted)). In making this determination, we focus on (1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant. <u>Rodríguez</u>, 675 F.3d at 62.

In contrast, we review for plain error "any part of the government's rebuttal argument which the defendant failed to object to." <u>Id.</u> at 64. To meet this "exacting standard," <u>id.</u>, the defendant must show that an error occurred, which was clear or obvious and which not only affected the defendant's substantial rights, but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings. <u>Id.</u>; <u>United States</u> v. <u>Pires</u>, 642 F.3d 1, 14 (1st Cir. 2011). "[P]lain error review tends to afford relief . . . only for 'blockbuster' errors." <u>Rodríguez</u>, 675 F.3d at 64 (citations omitted).

During the rebuttal argument, the government responded to González's reference that the "government ha[d] a problem" by stating: "Do you know how many times the government doesn't have evidence like you saw in this case?" The government also stated that defense counsel wanted to confuse the jury, since defense counsel was unable to make González disappear from the videos played at trial. González timely objected to both statements, and

the district court overruled both objections.  González now claims that the government improperly compared the evidence in this case to that in other cases and, thus, engaged in bolstering,[10] and that it misstated and disparaged the defense strategy by taking aim at defense counsel.

The challenged government statements were not improper. Regarding the first statement, defense counsel invited the prosecutor's comparison to other cases by stating that the government "ha[d] a problem in this case . . . . They are very concerned that they had to rely so much on Cotto and Eusebio Hernández to prove their charges."  It was reasonable for the prosecutor to respond that it did not have a problem because in this case, unlike many others, there was video evidence linking González to the crimes charged.  See United States v. Ayala-García, 574 F.3d 5, 18 (1st Cir. 2009) ("Our cases establish that some leeway is appropriate when the government's challenged comments may fairly be seen as a response to comparable remarks by defense counsel.").  And contrary to González's contentions, the government's comments cannot fairly be read to suggest that evidence not presented at trial supported the defendant's guilt.

---

[10]  We note that bolstering generally "occurs when a prosecutor implies that a witness's testimony is corroborated by evidence known to the government but not known to the jury." United States v. Valdivia, 680 F.3d 33, 48 (1st Cir. 2012) (citations omitted).

Instead, the prosecutor was pointing out how much inculpatory evidence the government had introduced at trial.

The prosecutor's further suggestions that defense counsel was trying to confuse the jury because he could not make González disappear from the videos, while perhaps impolitic, did not render the trial unfair. These comments, too, referred to the strength of the government's case (specifically, the fact that there was video evidence). Moreover, United States v. Manning, which González cites for his argument that the comments were improper, involved statements much more egregious than those in this case: there, the prosecutor stated that the role of the defense counsel in a criminal trial is to "cloud the issues or make smoke screens," and he "liken[ed] them to Shakespeare's players, full of sound and fury signifying nothing." 23 F.3d 570, 573 n.1 (1st Cir. 1994). Nothing like that was said in this case.

Finally, González alleges that the government misstated the law as to "reasonable doubt" and "criminal intent." Since González did not contemporaneously object to these allegedly improper statements, we review them only for plain error. Rodríguez, 675 F.3d at 64. González fails to meet that standard.

The statement regarding "reasonable doubt" was made in the context of the firearm charges and González was acquitted of all such charges, which makes clear that such alleged error does not meet the standard for plain error. As to the other statement,

the government said that "all criminal intent means is that [González] knew he was breaking the law." González has failed to show that, when read in context, the statement was clearly and obviously erroneous. Moreover, after closing arguments, the district court gave specific instructions as to what both criminal intent and reasonable doubt meant. González does not point to anything indicating that the jury disregarded these instructions and we ordinarily presume that juries follow instructions. See id. at 63. He has simply failed to show that the alleged misstatements of the law affected his substantial rights and seriously impaired the fairness, integrity, or public reputation of judicial proceedings. Pires, 642 F.3d at 14; see also Rodríquez, 675 F.3d at 65 (noting that the fact that defendant had objected to the prosecutor's statements during closing argument, but had failed to do so during rebuttal suggested that even the defendant "failed to regard the comments as having a damaging effect" (citations omitted)). Thus, the alleged errors do not constitute the "blockbuster" errors required to satisfy the plain error standard. Rodríquez, 675 F.3d at 64.

### III. Conclusion

The record reflects that González was afforded a fair and impartial trial, that he was not entitled to entrapment or duress instructions, that the denial of the requested instructions on impeachment of witnesses for prior convictions did not constitute

-32-

reversible error, and that his conviction was not tainted by prejudicial error either from the district court or in the government's rebuttal argument.  Accordingly, his conviction is affirmed.

**<u>Affirmed</u>**.