ORDER OF COURT
Daviel Salinas-Acevedo (“Salinas-Acevedo”) has filed a petition for a rehearing or rehearing en banc alleging “the panel decision conflicts with a decision ... of the court to which the petition is addressed.” Fed. R. App. P. 35(b)(1)(A). Salinas-Acevedo asserts that the panel’s January 13, *15 2017 decision, affirming the district court’s refusal to permit him to make an entrapment defense, conflicts with our prior holding in United States v. Gendron, where we noted that “[c]ourts have found a basis for sending the entrapment issue to the jury ... where government officials ... used ‘repeated suggestions’ which succeeded only when defendant had lost his job and needed money for his family’s food and rent.” 18 F.3d 955, 961 (1st Cir. 1994) (quoting United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir. 1993)). Because our January 13, 2017 decision does not conflict with Gendron, but instead finds the facts of this case distinguishable such that an entrapment instruction was not necessary, Salinas-Acevedo’s petition for panel rehearing is denied.
In our ruling rejecting Salinas-Acevedo’s argument that he was entitled to an entrapment defense, we first assumed that Salinas-Acevedo properly preserved his entrapment arguments, affording him the benefit of de novo review. We noted that a defendant seeking to present an entrapment defense at trial must demonstrate (1) improper inducement and (2) that he was not already predisposed to commit the crime. See United States v. Sánchez-Berríos, 424 F.3d 65 (1st Cir. 2005). Salinas-Acevedo’s argument relied on a derivative theory of entrapment, where a middleman’s actions can be attributable to the government if:
(1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent’s actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman’s inducement, the targeted defendant in fact engaged in the illegal conduct.
United States v. Luisi, 482 F.3d 43, 55 (1st Cir. 2007).
We noted that while Salinas-Acevedo met elements (1) and (2), he failed to meet his burden with regard to element (3)— namely, demonstrating that the government agent (Camacho) requested, encouraged, or instructed a middleman (Rullán-Santiago or Méndez-Perez) to employ a specified improper inducement. Although Salinas-Acevedo was presented with repeated opportunities to engage in the illegal activity and it is undisputed that he was facing difficult financial times, we found Camacho’s specific instructions not to pressure Salinas-Acevedo, along with other facts in this case, to be sufficient evidence that Camacho did not instruct the middlemen to engage in improper inducement.
In denying Salinas-Acevedo’s petition for rehearing, we take this moment to further clarify our holding in this case. “Inducement requires not only giving the defendant the opportunity to commit the crime but also a ‘plus’ factor of government overreaching.” United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015) (quoting United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013)). In González-Pérez, 778 F.3d at 12, another Operation Guard Shack defendant similarly claimed, as Salinas-Acevedo does here, that he had been targeted because of his difficult financial situation and had been repeatedly solicited despite his initial resistance. There, we held that the circumstances did not amount to improper government inducement because the government had *16 employed “no arm-twisting or undue coercive method,” Id. Additionally, we held that the defendant’s circumstances in that case—he “had various part-time jobs ... and ... thought that the high payment offered by [the government agent] would help him solve his financial situation”—was not enough to constitute, inducement. Id. Here, we hold that Salinas-Acevedo has similarly failed to produce any evidence of government overreach or arm-twisting.
Indeed, the record indicates and the parties assert .that Salinas-Acevedo was solicited, at most, a total of three times.[1] The first time took place at some point before March 9, 2010. During a call on March 9, 2010, Rullán-Santiago informed Camacho that at the last minute Salinas-Acevedo had decided not to participate in a sham drug deal. Rullán-Santiago told Camacho that Salinas-Acevedo had cited his daughter as the reason he could not participate. Rullán-Santiago also informed Camacho that in response to Salinas-Acevedo’s decision not to participate, Rullán-Santiago had told Salinas-Acevedo “[l]ook, [sic] is all right, bro” and to “[fjorget it, cool. That’s cool.”
The second time that a middleman solicited Salinas-Acevedo to take part in the sham drug deals presumably occurred after another recorded call. In that call Camacho spoke with Méndez-Perez, brought up Salinas-Acevedo, and asked Méndez-Perez what he thought of Salinas-Acevedo. The call is somewhat confusing, but ends, with Camacho . asking Méndez-Perez to talk to Salinas-Acevedo, and Méndez-Perez indicating that he would go to Salinas-Acevedo’s home to talk to him. Camacho specifically instructed Mendez-Perez not'to pressure Salinas-Acevedo, stating that “if he gives you a lot of crap ... [t]his isn’t compulsory, this is for those who want to and know what it is.”[2]
The last-indication in the record of Camacho instructing a middleman to recruit Salinas-Acevedo occurred sometime after March 19, 2010, During a call on that date, Camacho offers Rullán-Santiago an opportunity to work another sham drug deal. Rullán-Santiago jumps at the opportunity and Camacho asks him to “get that guy that you tried to find last time.” Rullán-Santiago responded that he would see .if Salinas-Acevedo was available, stating “[o]kay, let me see if, if that dog is around here.” Camacho then tells Rullán-Santiago to let him know for sure whether Salinas-Acevedo would participate because he did not want him to' “do the same shitty thing to me like you did last week”—when Salinas-Acevedo decided not to participate at the last minute.
Given these facts, we.find the three requests here, over approximately a ten-day period, do not amount to improper coercion for inducement by the government, Although Salinas-Acevedo was facing financial difficulties with the impending arrival of a second child, financial distress alone does not render the repeated presentation of an opportunity to commit a crime improper. See United States v. Baltas, 236 F.3d 27, 36 (1st Cir. 2001) (“Improper inducement goes beyond providing an ordi *17 nary opportunity to commit a crime. An inducement consists of an ‘opportunity’ plus something else—typically, excessive pressure by the government upon the defendant or the government’s taking advantage of an alternative, non-criminal type of motive.” (citations omitted)). And while we noted in Gendron, 18 F.3d at 961, that repeated suggestions in light of a defendant’s financial straits may merit an entrapment instruction, the facts of this case are distinguishable.
Unlike the defendant in Kessee, Salinas-Acevedo at no time faced any sudden change in means and therefore did not suffer from any increased vulnerability that would make the government’s later repeated offers to participate more objectionable. See Kessee, 992 F.2d at 1004 (noting that the “repeated entreaties ... only became, successful when Kessee had lost both his jobs” and “did not know where he would get the money for rent and food for his family”). Moreover,, the government agent here expressly instructed at least one middleman (Méndez-Perez) not to pressure Salinas-Acevedo. And although the second middleman (Rullán-Santiago) was never given such direct instructions, during the March 19, 2010 call when Camacho suggested that Rullán-Santiago “get that guy that you tried to find last time” (in reference to Salinas-Acevedo), Camacho also made clear that he simply wanted Rullán-Santiago to bring an associate to participate in the deal—not necessarily Salinas-Acevedo, but someone.
Indeed, Rullán-Santiago understood that if Salinas-Acevedo declined, to participate and he could not get someone else to join, they might postpone the deal. Camacho even made a specific suggestion that Rul-lán-Santiago could seek out an alternative participant (if Salinas-Acevedo was not available), such as another- individual “from Maricao, I don’t know, the one you had told me about.” Thus, Camacho never instructed Rullán-Santiago to employ inappropriate means to recruit Salinas-Acevedo,- but merely instructed him to provide Salinas-Acevedo with an opportunity—Salinas-Acevedo was free to decline and Camacho was only -interested in Rullán-Santiago recruiting a second corrupt officer to participate. Indeed, this lines up with the overall design of the sting operation to “hire” corrupt law enforcement officers to provide armed security at the staged drug deals, and then have those .officers recruit others to participate in subsequent deals, thereby .unwittingly assisting the sting in ferreting out additional corrupt officers. The dissent seems to find it important that Camacho never gave Rullán-Santiago éxplicit instructions not to pressure Salinas-Acevedo (like those given tó Méndez-Perez); however, the absence of such an instruction does not establish that the government instructed Rullán-Santiago to employ a specific improper method of inducement. And Rullán-Santiago was explicitly instructed only to recruit another corrupt cop, be it Salinas-Acevedo or some other officer. In sum, merely providing the opportunity to commit a crime, even if repeatedly, does not by itself rise to the level of improper government overreach. See Baltas, 236 F.3d at 37. We find that there is no evidence of an improper attempt to persuade Salinas-Acevedo to participate and that the government merely presented Salinas-Acevedo with an opportunity to commit a crime.
Although we believe the dissent takes several creative liberties in its reading of the record, drawing conclusions and inferences which are, in our view, unfounded, we briefly address a few of its concerns.[3] *18 As mentioned by the dissent, we are well aware that Salinas-Acevedo only has to present sufficient evidence that if believed by a rational juror would create a reasonable doubt that he committed the crime of his own accord. And as mentioned above, such a showing requires some evidence of improper inducement by the government. Unlike the dissent, we find that no such evidence exists here.
While we ultimately disagree with the dissent, we note the importance of the issue before us. On the one hand, we do not want to support a position, like the dissent’s, where all a defendant would have to show in order to be entitled to an entrapment defense is financial struggles and repeated asks by the government. On the other hand, we also do not want to affirm a standard so stringent that a defendant must essentially prove improper inducement beyond a reasonable doubt in order to be afforded an entrapment jury instruction. While mindful of these competing concerns, here, we struggle to find any evidence of improper government inducement. The mere fact that Salinas-Acevedo had some level of financial difficulty and was asked on more than one occasion if he wanted to participate in the sham drug deals without more is insufficient—there must be a “plus factor” of government overreach.[4] The record provides no information regarding the specifics of Salinas-Acevedo’s financial situation beyond the fact that he was concerned about providing for his family with the arrival of his second *19 child. But the record does indicate that Salinas-Acevedo was employed as a police officer. And while Salinas-Acevedo may have felt internal pressures to participate in the drug deals for money, there is no evidence in the record of improper attempts by the government to exploit that fact or improperly induce him to participate.
To be clear, we are not holding that repeated entreaties on any defendant, regardless of the facts, would be permissible and insufficient to merit an entrapment defense. We merely hold that where, as here, we have a defendant who declines to participate in illegal activity at the last minute, but later decides to commit the offensive act without any evidence that he eventually succumbed to governmental pressures due to changed financial means, the presentation of multiple opportunities to commit the crime without more is insufficient to amount to improper government inducement or coercion. The dissent simply disagrees with our reading of the record. This disagreement does not warrant rehearing.

. The dissent argues that it is "misleading” to say that there were only three solicitation requests. The dissent would have us speculate as to an infinite number of requests, However, we rely on the record as well as the parties’ representations and decline to speculate where the record is silent'.

. As noted in our original opinion, Mendez-Perez may have never followed through- on his plans to recruit Salinas-Acevedo as indicated during this call. See United States v. Rivera-Ruperto, 846 F.3d 417, 429 n.8 (1st Cir. 2017), We, however, assume arguendo that this [solicitation actually took place although thp record is. silent as to what was actually asked of or said to Salinas-Acevedo.

. The dissent misleadingly contends that the majority makes several "concessions,” which *18 we do not make. Our January 13, 2017 opinion does note that Salinas-Acevedo “backed out” of the first transaction at the last minute. We still believe this to be true and supported by the record. However, we acknowledge that the record does not provide any affirmative evidence of Salinas-Acevedo’s initial agreement to participate after the first request. The record indicates, however, that Salinas-Acevedo intended to participate in the first transaction until he realized that his daughter's daycare was closed on the Wednesday when the first transaction was scheduled and he had no one to watch her ("[Salinas-Acevedo is] the one who takes care of [his daughter]” and on that Wednesday when the initial transaction was scheduled, the daycare for Salinas-Acevedo’s daughter was closed—"they had no classes. There was no school [UI] and [Salinas-Acevedo] couldn’t [participate]”). Additionally, Salinas-Acevedo informed Rullán-Santiago that he would not participate in the first transaction the day before the transaction was scheduled.

. The "plus” factors identified by the dissent appear to be an assertion that Rullán-Santiago possessed some form of "contempt” for Salinas-Acevedo because he referred to him as a "dog” and the dissent’s insistence that there were "multiple, persistent requests by Rullán-Santiago.” The record simply does not bear these facts out. First, the inferential leap that Rullán-Santiago possessed some sort of "contempt” or was out to get Salinas-Acevedo specifically is speculative at best and contradicted by the record. Rullán-Santiago used foul language constantly when referencing individuals or circumstances. For instance, in one conversation, Rullán-Santiago referred to various individuals as "cunt,” "motherfucker,” "liar,” and "dick.” The fact that Rullán-Santiago, an often foul-talking individual, also referred to Salinas-Acevedo as "cabrón” or "dog” or "cuckold” as detailed by the dissent does not demonstrate that Rullán-Santiago possessed some overarching contempt driving him to persistently pursue Salinas-Acevedo. Second, even the dissent concedes that the "transcripts do not reveal, however, how many times the middlemen requested Salinas’s participation.” Thus, the dissent's contention that a jury could conclude that "multiple, persistent requests by Rullán-Santiago finally broke Salinas's resistance” is unsupported by the record—there is no evidence beyond the three calls referenced above of requests being made to Salinas-Acevedo. Moreover, and perhaps most importantly, even if the dissent’s take on the facts and record were true and well-supported, none of these facts demonstrate government overreach—the government agent (Camacho) never instructed either middleman to employ a specific improper tactic. And merely instructing a middleman to offer Salinas-Acevedo an opportunity to participate is insufficient.