TORRUELLA, Circuit Judge,
dissenting from denial of panel rehearing.
I cannot agree with the majority’s view that the present matter is merely a disagreement about how we read the record, and thus not worthy of rehearing. I believe our disagreement is more fundamental than that. It entails whether we recognize the legitimate role of the jury, or whether we will engage in a usurpation of that role. Our role as presented by the record in this case is to “determine whether the evidence is enough, ‘if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his own accord.’ ” United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015) (internal citations omitted). However, the majority, while paying lip service to this role, proceeds to invert it: it reasons that because, on the record, it might be true that Salinas was not entrapped, Salinas is therefore not allowed to argue to the jury that he was entrapped. Thus, the majority requires Salinas to prove his defense twice: once to the court, and then once more to the jury. In my view, this is not how things work.
The majority now recognizes that repeated requests can give rise to an entrapment defense, but does not incorporate that understanding into its reasoning at the most crucial point. Thus, the majority believes there is no evidence that Camacho (the government agent) instructed any of the middlemen to use improper means, hence, the majority reasons, an entrapment defense is inappropriate because there was no plus factor. What the majority misses is that the use of repeated requests is itself the kind of improper inducement or plus factor that gives rise to an entrapment defense. United States v. Gendron, 18 F.3d 955 (1st Cir. 1994) (“Some examples of improper ‘inducement’ may help. Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: ... used ‘repeated suggestions’ which succeeded only when defendant had lost his job and needed money for his family’s food and rent.”) (citing United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir.1993)). As I will explain below, the majority also misapplies Kessee (which found that an entrapment defense was required, and which we cited with approval in Gendron and United States v. González-Pérez, 778 F.3d 3, 11-13 (1st Cir. 2015) (where we found that no entrapment defense was required)).
Before turning to these precedents, however, it is essential to turn to the record and the effects it can have on a rational juror. Let me be clear, however, that I *20 do not argue that the disturbing aspects of the record are the improper inducement that is required for an entrapment defense; the repeated requests are the improper inducement. However, the record underscores that there is more than enough in this case for a rational juror to conclude that there is a reasonable doubt that Salinas would have committed the crime of his own accord. Three aspects of the record deserve particular attention: . -
1. In its January 13, 2017 decision, the majority claimed that Salinas had agreed to participate in the drug deal after the first request, and then reneged at the last minute. In fact, as the majority now concedes, “the record does not provide any affirms: . tive evidence of Salinas-Acevedo’s . initial agreement to participate after the first request.”
2. The majority claims that there were at most three requests. In fact, the record supports the inference there were more than three requests.
3. In its January 13, 2017 decision, the majority claimed that the government gave both middlemen the instruction not to pressure Salinas. In fact, as the majority now concedes, only Méndez-Pérez received this instruction, whereas Rullán-Santiago—who' finally broke' Salinas’s resistance—received no such instruction, but was told to “get that guy” and was given a financial incentive to do so.
As the majority now concedes, there is no evidence Salinas agreed to participate in the drug deal after the first request.[5] The record reveals that Rullán-Santiago (the middleman) informed Camacho (the government agent) that “[Salinas] sort of said it was no good, and no, no, no, no. You know? No.” As a reason for his refusal to participate in the drug deal, Salinas said “[s]orry, it is gonna be difficult for me because of the little girl and the like.” At no point in this transcript, or at any other place in the record, does it say that Salinas had ever agreed to participate in the drug deal—nor does the government even claim this in its brief. Rather, the only evidence is that Salinas repeated “no” at least six times.[6]
It is misleading to say, as the majority does, that there were at most three requests.[7] It is true that the record contains the transcripts of three conversations between the government agent and the two middlemen. Those transcripts do not reveal, however, how many times the middlemen requested Salinas’s participation. Es *21 pecially the second and third transcripts imply that each of the middlemen asked Salinas multiple times to participate in the drug deal. In the second transcript, it is Camacho (the government agent) who brings up the topic of Salinas. Méndez-Pérez (a middleman), who was “buddies with Salinas” and who was fully aware of Salinas’s financial troubles, would go to Salinas’s house. The government agent instructed this middleman that “if [Salinas] gives you a lot of crap,” then the middleman should leave Salinas alone. The government agent did not say “ crap” or “any resistance,” or something to that effect— he said “a lot of crap.” That is, the middleman had instructions to keep making requests until he got “a lot of crap.” Thus, numerous requests likely occurred until the middleman received the requisite amount of pushback from Salinas. In the third transcript, the government agent simply tells Rullán-Santiago to “get that guy”—meaning Salinas. When Rullán-Santiago asks whether he has to bring someone to the drug deal, the agent replies “What? Of course,” and- then tells the middleman to “[f]ind that guy.” That is, Rullán-Santiago will not be allowed to participate in the deal—and thus not be allowed to make money—unless he succeeds in bringing someone. Rullán-Santiago, in the meantime, had referred to Salinas as “that dog.”[8] Given such unambiguous instructions “to get” Salinas, given Rullán-Santiago’s financial incentive to do so, and given Rullán-Santiago’s apparent contempt for Salinas, a rational jury could conclude that multiple, persistent requests by Rullán-Santiago finally broke Salinas’s resistance.[9] Note that while Camacho had instructed Méndez-Pérez to leave- Salinas alone if Salinas gave him “a lot' of crap,” Rullán-Santiago received no similar instruction. He was never told that this deal was only for those who wanted it. He was never told not to apply pressure. But he was told to “get that guy.”
The majority here accuses the dissent of speculation. But the dissent is, in fact, fulfilling the proper role of the court in this situation:
[i]n order to be entitled to an instruction on entrapment, the record must show “some hard evidence” of both government inducement and the defendant’s lack of predisposition. This evidence must be more than uncorroborated self-serving assertions. In assessing the sufficiency of this evidence, the district court may not weigh the evidence, make credibility determinations or resolve conflicts in the evidence. Rather, it must determine whether the evidence is enough, -‘if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his Own accord.”
González-Pérez, 778 F.3d at 11 (internal citations omitted) (emphasis added). The dissent merely shows that .Salinas has squarely met his burden of presenting enough evidence to prevail on his entrapment defense in front of a rational jury. The majority, however, fully ignores what Salinas’s burden in fact is, and instead *22 proceeds to do precisely what a court is prohibited from doing here: to resolve conflicts in the evidence. Thus, the majority notes that, after Camacho told Rullán-San-tiago to “get that guy,” there was also a brief reference in the conversation to someone “from Maricao” as a potential alternative to Salinas, and promptly concludes that Camacho merely instructed his middleman to provide Salinas with an opportunity. Even if it were the case that this cursory reference to an alternative target could somehow negate the clear instruction to “get that guy,” it is emphatically not the court’s role to resolve this conflict in the evidence.
It is precisely the evidence that Salinas has presented that distinguishes the present case from González-Pérez, on which the majority relies. In González-Pérez, the defendant provided only a “bare assertion that [the confidential informant] called him several times and [the defendant] declined previous invitations to commit offenses .... ” 778 F.3d at 12. Indeed, the evidence in González-Pérez showed that the defendant was so “eager to avail himself of the opportunities to commit the crimes that he repeatedly told [a government agent] that he was ‘very grateful’ and ‘at his service,’ and exclaimed ‘Oh wow! That’s awesome, dude,’ upon learning of an additional opportunity to provide armed security.” Id. at 13. In addition, González-Pérez “cite[d] no evidence indicating that his financial situation was such that he was at a particularly vulnerable point in his life.” Id. at 12. Salinas, however, has provided hard evidence—in the form of the transcripts of recorded conversations—of his several refusals to participate in the drug deal as well as of his desperate financial situation. There is also no evidence to show that Salinas was eager to participate in this deal—to the contrary, he was apparently going to “jump off the balcony when he sees [the drugs].”
The present case is not, however, distinguishable from Kessee. As the majority correctly points out, in Kessee, the “repeated entreaties ... only became successful when Kessee had lost both his jobs” and “did not know where he would get the money for rent and food for his family.” Kessee, 992 F.2d at 1004. Like the defendant in Kessee, Salinas did not know how to provide for his family now that his wife was pregnant with their second child. The majority appears to believe that it is important that in Kessee, the defendant refused the requests to participate in a drug deal while he was still employed, but then gave in once he had lost his jobs. That is, Kessee’s resistance ceased once his finances worsened. Salinas, however, kept resisting even though his finances were desperate. If anything, Salinas has shown more resistance to committing a crime than Kessee had shown, not less, and is therefore all the more deserving of an entrapment defense.
The majority also appears to suggest that the compressed time period of approximately ten days during which the repeated requests took place works against Salinas. However, the short intervals between the repeated requests only increase the intensity of the pressure on Salinas, and thus only strengthen his case. Already in a desperate situation, Salinas was given little respite from the pressure. First, Rullán-Santiago asked him to participate in the deal; Salinas refused. Then, Méndez-Pérez came to his home; again, Salinas refused. Finally, Rullán-Santiago was out “to get” him; Salinas finally gave in. Still, he appeared to do so reluctantly, afraid of what he was getting himself into; in the words of Rullán-Santiago: “[Salinas] is going to jump off the balcony when he sees [the drugs].”
This case presents the exact situation that the entrapment defense serves to protect against:
*23 When the Government’s quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.
Gendron, 18 F.3d at 961 (quoting Jacobson v. United States, 503 U.S. 540, 543, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) and adding emphasis). Salinas has no criminal record, nor was there even the slightest indication that he had ever been engaged in any police corruption. Rather, he approached Rullán-Santiago to look for a legitimate job in order to support his family. Rullán-Santiago was at that time moonlighting as the head of security at Comp USA, and Salinas hoped to find a job as a part-time security officer at Comp USA. He explained his dire situation to Rullán-Santiago. Rullán-Santiago informed him that no such jobs were available. This took place some four months before the sham drug transaction for which Salinas is now in prison. Salinas never sought to participate in a crime, and, if left alone by the government agent and his middlemen, likely never would have. The injustice reaped upon Salinas by the decision of this court in foreclosing his presentation of a legitimate claim to an entrapment defense cannot be accepted without my most fervent objection.
I dissent.

. The majority finds that the record indicates this. First, the question before us is whether a rational juror could find for Salinas, not whether a rational juror could .find against him. Suggestions in the record that favor Salinas are therefore appropriate; suggestions thát go' against him are inapposite. In any event, the suggestions the majority relies on is a reference to his daughter, being in daycare and him taking care of her made some two weeks after he declined to participate in the first drug deal. Note also that the middleman did not believe the explanation.

. The majority appears to emphasize that Salinas refused to participate in the transaction at the last minute. It is unclear what the significance of this timing is for the present case—Salinas refused when he was approached by Rullán-Santiago, and it was thus Rullán-Santiago who chose the timing. In any event, the record only shows that Rullán-Santiago informed Camacho on Tuesday morning of Salinas’s refusal to participate in the Wednesday transaction. The record is silent as to when Salinas in fact refused to participate.

. The majority claims—without citing to the record—that the parties agreed that there were only three requests. The- dissent has found no support for this in the record. If , anything, Salinas emphasizes the intensity with which his resistance was broken down.

. In fact, Rullán-Santiago called Salinas a "cabrón.” This Spanish word is far more offensive than the English word ''dog,” and is more accurately translated as “cuckold.”

. The majority does not believe that Rullán-Santiago's use of foul language signifies any contempt for Salinas, because, as the majority details, Rullán-Santiago used foul language frequently. This only makes it more likely, however, that Rullán-Santiago's requests that Salinas participate in a drug transaction were not polite requests—but rather ones filled with intimating foul language—and the fact that the government agent knowingly chose exactly this middleman "to get that guy” does not help the majority’s case either. ’