# United States Court of Appeals
## For the First Circuit

Nos. 13-2017, 13-2047, 13-2072

UNITED STATES,

Appellee,

v.

WENDELL RIVERA-RUPERTO, a/k/a Arsenio Rivera,
MIGUEL SANTIAGO-CORDERO,
DAVIEL SALINAS-ACEVEDO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

H. Manuel Hernández for appellant Wendell Rivera-Ruperto.
Ignacio Fernández de Lahongrais for appellant Daviel Salinas-Acevedo.
Camille Lizarribar-Buxó on brief for appellant Miguel Santiago-Cordero.
Robert J. Heberle, Attorney, Public Integrity Section, Criminal Division, U.S. Department of Justice, with whom Juan Carlos Reyes-Ramos, Assistant United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney, were on brief, for appellee.

January 13, 2017

THOMPSON, __Circuit Judge__.  In this appeal, Defendant-Appellants Wendell Rivera-Ruperto, Daviel Salinas-Acevedo, and Miguel Santiago-Cordero challenge various aspects of their trial and sentencing.  For Rivera-Ruperto, this was his second of two trials, which were presided over by different district judges.  Having separately addressed Rivera-Ruperto's challenges from the first trial in a decision simultaneously released herewith, we address in this opinion Rivera-Ruperto's challenges, as well as those of Salinas-Acevedo and Santiago-Cordero, as to the second trial only.

During trial, all three defendants were convicted of various federal drug and firearms-related crimes for participating in drug deals that were staged as a part of the FBI sting operation "Operation Guard Shack," about which we say more in a bit.  As a result of the convictions, each was sentenced to multiple years of imprisonment.  In the present appeal, Rivera-Ruperto raises similar challenges, which we detail momentarily, to those he raised in his appeal of his first trial and sentencing.  As for Salinas-Acevedo, he argues the district court erred in preventing him from presenting an entrapment defense.  Santiago-Cordero presses a similar argument, challenging the judge's refusal to give an entrapment jury instruction, and also appeals the district court's denial of his post-verdict motion for acquittal.

For the reasons stated below, we affirm.

**OVERVIEW**

We begin with a broad overview of the facts, and later return to the specific details of the case as they relate to the individual defendants' arguments.

Operation Guard Shack, as we have explained in previous decisions,[1] was a large-scale investigation mounted by the FBI over several years in order to root out police corruption throughout Puerto Rico. Each of the stings followed a similar pattern. Undercover FBI informants recruited police officers to provide armed security at drug deals staged by the FBI. The deals took place at FBI-monitored apartments wired with hidden cameras, and involved undercover officers posing as sellers and buyers of sham cocaine. In exchange for their armed security services, the police officers were paid about $2,000 per deal.

Rivera-Ruperto, Salinas-Acevedo, and Santiago-Cordero provided armed security at several of these Operation Guard Shack sham drug deals between March and September of 2010. Rivera-Ruperto, who was not a police officer (but who was recruited because he misrepresented himself to the FBI's undercover informant as a prison corrections officer) provided armed security

---

[1] See, e.g., United States v. Navedo-Ramirez, 781 F.3d 563 (1st Cir. 2015); United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015); United States v. Diaz-Castro, 752 F.3d 101 (1st Cir. 2014).

at six deals, which took place on April 9, April 14, April 27, June 9, June 25, and September 16 of 2010. Salinas-Acevedo and Santiago-Cordero, who were both police officers, participated in one deal each, on March 24, 2010, and July 8, 2010, respectively.

The government charged the three defendants with one count each of conspiracy and attempted possession with intent to distribute a controlled substance, as well as possession of a firearm in relation to a drug trafficking crime. (Various other co-defendants were also charged, but their cases are not before us.) In this indictment, Rivera-Ruperto was charged for his participation in the April 9 deal only. For his participation in the five later deals, Rivera-Ruperto had already been indicted separately, tried before a different district judge, and found guilty. The first judge sentenced Rivera-Ruperto to 126-years and 10-months' imprisonment.

Several months after Rivera-Ruperto's first trial, he, Salinas-Acevedo, and Santiago-Cordero were tried together in a second proceeding, which is the subject of this appeal. The jury found Rivera-Ruperto guilty of all charges, and Salinas-Acevedo and Santiago-Cordero guilty of the conspiracy and firearms counts (it did not reach a verdict for either of them on the attempted possession count). After separate sentencing hearings, the district judge sentenced Rivera-Ruperto to 35-years imprisonment to be served consecutively with his first sentence, resulting in

- 5 -

a combined prison sentence from Rivera-Ruperto's two trials that totaled 161 years and 10 months.  Salinas-Acevedo and Santiago-Cordero were each sentenced to 15-years and 1-month imprisonment.

The defendants timely appealed.  Rivera-Ruperto challenges various aspects of the trial and sentencing, and Salinas-Acevedo and Santiago-Cordero of the trial only.  We discuss below each defendant in turn, beginning with Rivera-Ruperto.

## DISCUSSION

### I. RIVERA-RUPERTO

As we have previously noted, we issue today a companion decision to this case affirming the district court in Rivera-Ruperto's first trial and sentencing.  Rivera-Ruperto's challenges here are similar to those he raised in that first appeal.  Specifically, Rivera-Ruperto argues that the district court in this second case committed reversible errors when it: (1) failed to conduct a sua sponte inquiry to determine whether Rivera-Ruperto had received ineffective assistance of counsel during the plea-bargaining stage; (2) gave erroneous jury instructions; (3) did not reduce his sentence on account of sentencing manipulation by the government; and (4) sentenced him to a grossly disproportionate sentence in violation of the Eighth Amendment.  For the reasons we explain, each of these challenges fails in this second appeal, as well.

## A.    **Lafler** Claim

Rivera-Ruperto reprises a Lafler challenge that he made (and lost) in his first appeal, in which he argues that he received ineffective assistance of counsel during the plea-bargaining phase.  See Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012) (holding that a defendant's Sixth Amendment right to competent counsel extends to the plea-bargaining process).  Before getting to his arguments, we give a brief recounting of what happened below.

### 1.    **Background**

We set what is quite the complicated stage by again reminding the reader that Rivera-Ruperto eventually stood two trials, which were presided over by different district judges. Before the first trial began, Rivera-Ruperto was represented by court-appointed attorney Jose Aguayo ("Aguayo"), who remained his lawyer throughout the plea-bargaining stage.

Aguayo attempted to negotiate a plea deal for all of Rivera-Ruperto's charges across the six sham drug deals (though Rivera-Ruperto had been indicted separately for the charges).  When the negotiations resulted in no plea deal, the first case proceeded toward trial, this time with Rivera-Ruperto represented by different court-appointed counsel.

Three days before that first trial was set to begin, Rivera-Ruperto's second attorney filed a Lafler motion, alleging

that Aguayo had provided ineffective assistance of counsel at the plea-bargaining stage. He argued that but for Aguayo's deficient performance, Rivera-Ruperto would have taken a 12-year plea deal that the government had previously offered during negotiations, and he requested that the court order the government to re-offer that 12-year deal.

On the morning of the day the first trial was scheduled to begin, the presiding judge held an evidentiary hearing on the issue. After considering the testimony and documentary evidence, the judge denied Rivera-Ruperto's ineffective assistance of counsel claim. For reasons that we explain in detail in our companion decision and will not rehash here, we have already affirmed the judge's denial of Rivera-Ruperto's Lafler claim as it pertains to his first trial.

Some months after the first trial and sentencing, Rivera-Ruperto, represented by the same attorney, stood trial a second time for the charged offenses stemming from his participation in the April 9 deal only. At no time did trial counsel request that the second judge consider the Lafler argument Rivera-Ruperto had raised and lost before the first judge. Therefore, no ineffective assistance of counsel claim was raised by counsel or ruled upon by the judge in this second case.

**2. Analysis**

- 8 -

On appeal, Rivera-Ruperto acknowledges that counsel during his second trial never raised the Lafler issue, but he argues that the trial judge should nevertheless have made a sua sponte inquiry and independent ruling on the ineffective assistance of counsel claim. The judge's failure to do so, he claims, was reversible error.[2]

Rivera-Ruperto never raised the Lafler issue before the second presiding judge, and we assume his claim was forfeited and not waived. We thus review the judge's purported failure to make a sua sponte inquiry on the ineffective assistance of counsel claim

_____

[2] The government raises a threshold argument that, because Rivera-Ruperto had already obtained a ruling on the Lafler issue in the first case, he was collaterally estopped from raising an identical issue in his second trial.

Collateral estoppel, often referred to as issue preclusion, traditionally barred civil litigants from relitigating an issue that had already been decided in an earlier action. But it has also become an "established rule of federal criminal law," and "is a part of the Fifth Amendment's guarantee against double jeopardy." United States v. Collazo-Aponte, 216 F.3d 163, 198 (1st Cir. 2000), vacated on other grounds by 532 U.S. 1036 (2001). As such, our case law has permitted the use of collateral estoppel in criminal cases -- at least insofar as it is invoked by the defendant to prevent the government from relitigating a previously-decided issue. See id.

The parties disagree over whether collateral estoppel may be used here, by contrast, offensively against Rivera-Ruperto. Indeed, we know of no case in our circuit, and the government points us to none, in which we have used collateral estoppel to prevent a criminal defendant from raising an issue, as the government would have us do in this case. We need not decide this issue today, however, and will not. As we explain, even if we assume, favorably to Rivera-Ruperto, that he is not collaterally estopped from raising his Lafler claim, the claim still fails.

for plain error.  United States v. Sánchez-Berríos, 424 F.3d 65, 74 (1st Cir. 2005) ("[A] waived issue ordinarily cannot be resurrected on appeal, whereas a forfeited issue may be reviewed for plain error".).

Reversal under plain error review is only proper if: (1) an error occurred; (2) it was obvious; (3) it affects the defendant's substantial rights; and (4) it is sufficiently fundamental to threaten the fairness, integrity or public reputation of the proceedings.  United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014).  Rivera-Ruperto cannot succeed in meeting these requirements.  Even assuming that he clears the first three of the plain error review hurdles, Rivera-Ruperto cannot clear the fourth, because he cannot show that the judge's purported error was sufficiently fundamental to threaten the fairness, integrity or public reputation of the proceedings.

In order to meet this fourth requirement, Rivera-Ruperto would need to show that if the judge had made a sua sponte inquiry into his ineffective assistance of counsel claim, she would indeed have found that Rivera-Ruperto had received ineffective assistance at the plea-bargaining stage, and was therefore entitled to appropriate relief.  But, for reasons we explain in great detail in our companion decision to this case, and which we will not belabor here, we have already determined, on de novo review, that Rivera-Ruperto was not entitled to Lafler relief, as he cannot

meet the two-part ineffective assistance of counsel test laid out in Strickland v. Washington, 466 U.S. 668, 687 (1984). See Lafler, 132 S. Ct. at 1376. Specifically, Rivera-Ruperto is unable to show either that Aguayo's performance was defective or that, even if defective performance were to be assumed, it prejudiced him. Thus, any claimed error on the second judge's part in failing to conduct a sua sponte Lafler inquiry did not threaten the fairness or integrity of Rivera-Ruperto's proceedings, and reversal on this ground is not proper.

## B. Alleyne Issue

We move on to Rivera-Ruperto's appeal of the jury instructions at his second trial, the only one of Rivera-Ruperto's claimed errors that we have not also addressed in our companion decision. Rivera-Ruperto challenges the jury instructions regarding the firearms charges only, so we focus our discussion accordingly. First, a discussion of what happened below.

### 1. Background

Before we begin, we pause to remind the reader that at his first trial, among other offenses, Rivera-Ruperto had been charged with and convicted of one count of possession of a firearm in relation to a drug trafficking crime for his participation in each of five sham drug deals (which occurred on April 14, April 27, June 9, June 25, and September 16 of 2010). Under 18 U.S.C. § 924(c)(1)(A), a defendant who is convicted of possession of a

firearm in relation to a drug trafficking crime is subject to a mandatory minimum sentence of 5-years imprisonment on the first conviction, and then 25-years imprisonment for every subsequent conviction, id. § 924(c)(1)(C)(i), to be served consecutively, id. § 924(c)(1)(D)(ii).  Accordingly, following the trial, the first district judge sentenced Rivera-Ruperto to a total of 105 years imprisonment for his firearms convictions (5 years for the first § 924(c) conviction, and 25 for each of the subsequent four convictions).

At the second trial, Rivera-Ruperto was again tried, among other offenses, for possession of a firearm in relation to a drug trafficking crime, this time for his participation in the April 9, 2010 drug deal only.  Notable for Rivera-Ruperto's purposes, the government did not introduce at the second trial any evidence of Rivera-Ruperto's prior § 924 convictions from his first trial.  In addition, while the judge instructed the jury as to the elements of the firearms offense, neither the jury instructions nor the verdict form included prior § 924 convictions as an "element" of the offense, or otherwise made any mention of Rivera-Ruperto's prior convictions.[3]  After deliberating, the jury found Rivera-Ruperto guilty of all counts.

---

[3] The verdict form, which Rivera-Ruperto did not object to, simply stated: "We, the Jury, find defendant WENDELL RIVERA RUPERTO _____ (GUILTY/NOT GUILTY) as charged in Count Eighteen of the Indictment."

Prior to sentencing, Rivera-Ruperto filed a sentencing memorandum in which he argued that -- notwithstanding his five previous § 924 convictions from the first trial -- the judge should impose the 5-year mandatory minimum sentence for a first-time conviction under the firearms statute, and not the 25-year minimum for subsequent convictions. Rivera-Ruperto argued that the judge could not impose the "enhanced" mandatory minimum because the jury had not made a beyond-a-reasonable-doubt finding as to his prior § 924 convictions.

The judge disagreed, denying the request in a written order prior to sentencing. After a hearing, the judge imposed the 25-year minimum sentence for a subsequent § 924 conviction. Rivera-Ruperto now appeals.

**2. Analysis**

Because the sentencing memorandum Rivera-Ruperto filed before the district court preserved his Alleyne challenge, our review of his argument on appeal is de novo.[4] See Delgado-Marrero, 744 F.3d at 184.

In order to explain Rivera-Ruperto's argument, we must first give a bit of background on the relevant case law. At the

---

Count Eighteen of the Indictment charged Rivera-Ruperto with "knowingly possess[ing] a firearm in furtherance of a drug trafficking crime as defined in Title 18, United States Code, Section 924(c)(2)," but made no mention of prior convictions under 18 U.S.C. § 924.

[4] Jury instruction challenges generally must be preserved at

time of Rivera-Ruperto's second trial, the rule was (and still is, as we explain in a moment) that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is an element of the offense to be found by a jury beyond a reasonable doubt.  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (emphasis added).  In making this exception for prior convictions in Apprendi, the Supreme Court deliberately left undisturbed its holding in Almendarez-Torres v. United States, 523 U.S. 224, 226-27 (1998), which permitted the use of prior convictions to enhance sentences without a finding by the jury.

Between Rivera-Ruperto's trial and sentencing, the Supreme Court decided Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013), in which it held that the Apprendi rule applied not only to facts that increase the mandatory maximum sentence, but also to those that increase the mandatory minimum (thus overruling its prior holding in Harris v. United States, 536 U.S. 545, 568 (2002), which had limited Apprendi to the former).  The Supreme Court explicitly stated, however, that its decision would leave untouched Almendarez-Torres's "narrow exception" for prior convictions.  Alleyne, 133 S. Ct. at 2160 n.1.

---

trial, but a defendant may preserve his challenge to an instructional Apprendi/Alleyne error by objecting at sentencing. See United States v. Pizarro, 772 F.3d 284, 296 (1st Cir. 2014). The government also concedes that our review here is de novo.

Despite this language in _Alleyne_ itself, Rivera-Ruperto argues before us that _Alleyne_ made _Almendarez-Torres_ inapplicable to his case. He seems to argue that, because _Alleyne_ expanded the _Apprendi_ umbrella, bringing facts that increase mandatory minimums under its shelter, we should, in keeping with the spirit of _Alleyne_, limit _Almendarez-Torres_ to its facts and determine that only prior convictions that increase the prescribed maximum are exempt from the _Apprendi_ rule that such facts be found by a jury. Because his prior convictions increased the prescribed minimum, Rivera-Ruperto argues, they should be subject to _Alleyne_'s requirement that they be found by a jury beyond a reasonable doubt.

But this is not the law. As we have already explained, this was not the Supreme Court's holding in _Alleyne_. Moreover, we have already rejected, in a post-_Alleyne_ case, the argument that prior convictions must be proven to a jury beyond a reasonable doubt. See _United States_ v. _Rodriguez_, 759 F.3d 113, 122 (1st Cir. 2014) (holding that the jury was not required to make a finding as to the defendant's prior convictions because _Almendarez-Torres_ remained good law). We therefore find no error.

## C. Sentencing Challenges

Rivera-Ruperto's remaining two challenges concern his sentence. He argues, as he did in his appeal from the first trial, that the government engaged in improper sentencing manipulation, and that his sentence across the two trials, for a combined 161-

years and 10-months' imprisonment, violates the Eighth Amendment's prohibition on cruel and unusual punishment. In raising these arguments in the present appeal, Rivera-Ruperto incorporates by reference the sections of his brief from his appeal in the first trial. As we have already discussed these arguments in detail in our companion decision, we keep our recounting of what happened concise.

### 1. Background

At the first trial, the jury found Rivera-Ruperto guilty of five counts each (one for each of the five charged drug deals) of conspiracy and attempted possession with intent to distribute 5 kilograms or more of a controlled substance and of possession of a firearm in relation to a drug trafficking crime. It also found Rivera-Ruperto guilty of one count of possession of a firearm with an obliterated serial number.

At sentencing, Rivera-Ruperto argued that the FBI's use of "large" quantities of sham cocaine at each of the drug deals, its request that he bring a firearm to each of the deals, its decision to allow him to participate in multiple deals, and its decision to charge him separately for each of the deals all constituted improper sentencing manipulation because, he claimed, the government made those choices for the sole purpose of exposing him to an enhanced sentence. The first district judge disagreed,

- 16 -

and sentenced Rivera-Ruperto to 126 years and 10 months for the crimes.

At his second trial, Rivera-Ruperto was again found guilty, this time of one count each of three crimes (for the remaining April 9 drug deal only): conspiracy and attempted possession with intent to distribute 5 kilograms or more of a controlled substance, and possession of a firearm in relation to a drug trafficking crime.

After a sentencing hearing, during which Rivera-Ruperto's counsel did not raise a sentencing manipulation objection, the second district judge sentenced Rivera-Ruperto to the statutory minimum of 10-years imprisonment for the conspiracy and attempt counts and the statutory minimum of 25-years imprisonment for the firearms count. Rivera-Ruperto was thus sentenced to a total of 35-years imprisonment, to be served consecutively to his 126-year and 10-month sentence from the first trial.

## 2. Sentencing Manipulation

Because Rivera-Ruperto did not raise a sentencing manipulation challenge before the second district judge, we review for plain error.[5] See Sánchez-Berríos, 424 F.3d 65 at 78.

---

[5] Rivera-Ruperto did raise his sentencing manipulation argument during his first sentencing hearing before the first district judge, and it would therefore be reasonable to treat the sentencing manipulation argument as altogether waived as to his

Rivera-Ruperto argues that the government engaged in sentencing manipulation by using unnecessarily high quantities of sham drugs during the deals, requiring Rivera-Ruperto to bring a firearm with him to each of the deals, and then allowing him to participate in a "seemingly endless" number of those deals. We need not tarry in our consideration of Rivera-Ruperto's sentencing manipulation argument here. In our companion decision, we explain in detail why Rivera-Ruperto's fact-determinative sentencing manipulation argument fails under a clear-error standard of review. In renewing his challenge as to this second trial, Rivera-Ruperto has added no new argument, choosing merely to incorporate by reference the sections of his brief from his first appeal. Because Rivera-Ruperto has adopted his briefing from the first case wholesale, the only difference in our review here is that the more rigorous plain-error standard applies. Given that Rivera-Ruperto's sentencing manipulation challenge failed under the less exacting standard in the first case, it also fails here.

### 3. Eighth Amendment

The same is true of Rivera-Ruperto's final challenge: his argument that his total sentence from the two trials of 161-years and 10-months' imprisonment violates the Eighth Amendment's

---

second sentence. The government, however, does not argue waiver in its brief. Thus, favorably to Rivera-Ruperto, we review for plain error.

prohibition on cruel and unusual punishment.  Here, Rivera-Ruperto again adopts by reference the Eighth Amendment section of his brief in the first appeal, which fails for the reasons we have already explained in our decision in that case.  For the reasons stated in our companion opinion, Rivera-Ruperto's sentence is affirmed.

## II. SALINAS-ACEVEDO

We turn now to Salinas-Acevedo's appeal.  As we noted above, Salinas-Acevedo was indicted on charges of conspiracy to distribute and attempted possession with the intent to distribute more than 5 kilograms of cocaine, as well as of possession of a firearm in furtherance of a drug crime, for his participation in one Operation Guard Shack deal on March 24, 2010.  The jury found Salinas-Acevedo guilty of the conspiracy and firearm counts, but did not reach a verdict as to the attempted possession count.  Salinas-Acevedo was sentenced to a total of 15-years and 1-month imprisonment.

Salinas-Acevedo raises just one argument on appeal.  He argues that the district court erred in preventing him from presenting an entrapment defense at trial.  We begin with a discussion of what happened below.

A.   Background

1.   Lead-Up to the March 24 Deal

On March 24, 2010, fellow police officers Salinas-Acevedo, Alwin Camacho ("Camacho"), and Israel Rullán-Santiago

("Rullán-Santiago")[6] provided armed security at an Operation Guard Shack drug deal. What Salinas-Acevedo did not know at the time was that Camacho was working undercover as an FBI informant to recruit corrupt police officers for Operation Guard Shack.

Camacho had targeted Rullán-Santiago after he heard Rullán-Santiago bragging around the station that he knew drug traffickers and was "basically a delinquent using up the uniform." It was Rullán-Santiago who, in turn, recruited his friend Salinas-Acevedo. Both Rullán-Santiago and Camacho were aware that Salinas-Acevedo had a daughter and was expecting another child, and that he was in a difficult financial situation.

Originally, Salinas-Acevedo was supposed to participate in a drug transaction that had been planned for March 10, 2010. But, according to a recorded telephone conversation between Rullán-Santiago and Camacho on the night before that deal, Salinas-Acevedo, seemingly referring to his child, backed out at the last minute, telling Rullán-Santiago, "Sorry, it's gonna be difficult for me because of the little girl and the like." Hearing that Salinas-Acevedo would not make it to the deal, Camacho postponed the scheduled transaction.

Shortly thereafter, Camacho was also recorded talking to Carlos Méndez-Pérez ("Méndez-Pérez"), yet another police officer

---

[6] Rullán-Santiago was one of the co-defendants in this case below, but is not a party to this appeal.

- 20 -

who would himself participate in Operation Guard Shack and be charged separately in a different case. During the conversation, Camacho brought up Salinas-Acevedo. Camacho asked, "[S]ince you're buddies with Salinas, what do you think about Salinas?" He went on to say, "Because, um, Rullán approached him and later he gave me excuses that his daughter . . . ." Camacho told Méndez-Pérez that Rullán-Santiago had told him that Salinas-Acevedo was "willing to do anything and he's broke."

Camacho also told Méndez-Pérez that he had directed Rullán-Santiago not to "bring up that topic with [Salinas-Acevedo] anymore." But later in the conversation, Camacho told Méndez-Perez to talk to Salinas-Acevedo and have him "come by" to see him. In response, Méndez-Pérez told Camacho that he would stop by Salinas-Acevedo's house. Camacho instructed Méndez-Pérez to find out what days Salinas-Acevedo "ha[d] available," but also directed Méndez-Pérez, "[I]f he gives you a lot of crap[;] . . . [t]his isn't compulsory, this is for those who want to and know what it is."

On March 19, 2010, in another recorded phone conversation with Rullán-Santiago, Camacho directed Rullán-Santiago to "get that guy that you tried to find last time," by which he meant Salinas-Acevedo. Rullán-Santiago responded, "[L]et me see if, . . . if that dog is around here." Camacho replied,

"Well, but let me know for sure, don't do the same shitty thing to me like you did last week."

Three days later, Camacho, who by then presumably knew Salinas-Acevedo had agreed to the job, called Rullán-Santiago to "double check[]" that Rullán-Santiago and Salinas-Acevedo were both on board for the upcoming March 24 drug deal. In a not-entirely-clear exchange, Camacho asked Rullán-Santiago, "You told Salinas what it was, right, the devices?" Rullán-Santiago at first told Camacho "Yes," but then laughed and told Camacho that Salinas-Acevedo would "jump off the balcony when he sees [the drugs]."

The story ends, as we know, with the deal going down as planned, with Rullán-Santiago and Salinas-Acevedo being arrested and brought up on charges, and with Salinas-Acevedo standing trial.[7]

### 2. Lead-Up to Trial

Before trial, the government moved in limine to preclude Salinas-Acevedo from raising an entrapment defense in his opening statement. The district court initially denied the motion, but when the government filed a motion for reconsideration of the order, the trial court ordered Salinas-Acevedo to proffer his evidence supporting an entrapment defense.

---

[7] Rullán-Santiago took a plea deal, and was eventually sentenced to 19-years imprisonment.

Salinas-Acevedo proffered the following.  First, he asserted that, at all relevant times, Camacho had been aware of Salinas-Acevedo's difficult financial situation because Salinas-Acevedo had previously asked Camacho about part-time opportunities at CompUSA, where Camacho worked as a part-time security guard, and Camacho had told Salinas-Acevedo that he would let him know if any opportunities opened up.  Second, Salinas-Acevedo submitted a transcript of the recorded conversations between Camacho and Rullán-Santiago and Méndez-Pérez, which Salinas-Acevedo argued showed that Camacho had targeted and incited Salinas-Acevedo into participating in the sham drug deals.

Finally, Salinas-Acevedo alleged that he had been wrongly induced into committing the crime because Rullán-Santiago had told him that the March 24 transaction was a "legitimate business transaction" involving the sale of diamonds, and that it was only after he had arrived at the location that it was revealed to him that it was a drug deal.  However, at the court's subsequent prompting, Salinas-Acevedo conceded that he did not have any evidence that the government (through Camacho) had directed Rullán-Santiago to tell Salinas-Acevedo that it was a legitimate transaction, or that Camacho was otherwise responsible for the alleged misinformation.

By sealed ex parte order, the court held that this was an "insufficient basis to allow defendant Salinas to mention to

- 23 -

the jury in opening statements a defense of entrapment," and vacated its previous order denying the government's motion in limine. Accordingly, Salinas-Acevedo was not permitted to mention entrapment in his opening statement.

At trial, over the objections of Rivera-Ruperto and Santiago-Cordero (our third co-defendant in this appeal, who we will get to know better shortly), the district court declined to give the jury an instruction on the entrapment defense. Salinas-Acevedo did not join in that objection to the jury instructions. Salinas-Acevedo now appeals, arguing that the district court erred in preventing him from raising an entrapment defense.

## B. Analysis

The government argues that Salinas-Acevedo neither requested an entrapment instruction, nor joined in his co-defendants' jury instruction objection during trial, and that his claim is therefore unpreserved and subject to plain error review. See United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013). Salinas-Acevedo argues that our review is de novo, presumably on a theory that his objection to the government's motion in limine was sufficient to preserve his objection to being denied a jury instruction on entrapment as well. But even assuming, favorably to Salinas-Acevedo, that the claim was properly preserved, the argument still fails under de novo review.

The judicially-created doctrine of entrapment exists "to prevent 'abuse[]' of the 'processes of detection and enforcement . . . by government officials' who might instigate an illegal 'act on the part of persons otherwise innocent in order to lure them to its commissions and to punish them.'" United States v. Díaz-Maldonado, 727 F.3d 130, 137 (1st Cir. 2013) (quoting Sorrells v. United States, 287 U.S. 435, 448 (1932)) (alteration and omission in original). A defendant seeking to present an entrapment defense at trial must satisfy an "entry-level burden of production." Sánchez-Berríos, 424 F.3d at 76. He must produce "evidence which fairly supports the claims" that: (1) the government agents not only induced the crime but did so improperly, and (2) that he was not already predisposed to commit the crime. Id. at 76-77.

In determining whether a defendant has met this two-part burden, a court "is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense." United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998). If the defendant succeeds and the defense is introduced at trial, it becomes the government's obligation to prove beyond a reasonable doubt that no entrapment occurred.

We begin by examining whether Salinas-Acevedo has satisfied the improper inducement prong of his two-part burden.

Because Salinas-Acevedo did not deal directly with Camacho -- the "government agent" in this case, see United States v. Luisi, 482 F.3d 43, 53 (1st Cir. 2007) (explaining that an individual hired as a government informant constitutes a government agent for entrapment purposes) -- but was brought into the deal by a middleman (Rullán-Santiago), Salinas-Acevedo must rely on a derivative theory of entrapment. Under this theory, the conduct of a middleman is only attributable to the government where:

> (1) the government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

Luisi, 482 F.3d at 55.

Salinas-Acevedo satisfies the first two of these requirements. The recorded conversations proffered by Salinas-Acevedo show Camacho more than once asking Rullán-Santiago and Méndez-Pérez about Salinas-Acevedo, and encouraging them to get Salinas-Acevedo involved in the drug deals. Viewing the evidence in the light most favorable to Salinas-Acevedo, a jury could conclude that Camacho targeted Salinas-Acevedo and used at least

Rullán-Santiago, if not both middlemen,[8] to induce him to participate in the March 24 transaction.

In order to meet the third requirement, however, Salinas-Acevedo must show that the <u>government</u> (via its agent Camacho) encouraged Rullán-Santiago to employ a specific "improper" inducement.[9] <u>Id.</u> The key issue here is whether a specified improper inducement by Rullán-Santiago (or Méndez-Pérez) can be attributed to the government itself. The government would be responsible for any improper inducement by either middleman if

---

[8] It appears Méndez-Pérez may not have attempted to recruit Salinas-Acevedo. The video recording from the March 24 drug deal shows Camacho asking Salinas-Acevedo if he knows anyone "trustworthy" that he would recommend for future deals, to which Salinas-Acevedo suggests his "buddy" Méndez-Pérez, and then appears surprised to hear that Méndez-Pérez was "already part of the clan." The government argues that if Méndez-Pérez had actually induced Salinas-Acevedo into participating in the March 24 drug deal, Salinas-Acevedo would not have been surprised to hear he was already in on the conspiracy. Salinas-Acevedo does not challenge this argument.

[9] Salinas-Acevedo appears to raise an alternative argument in his reply brief that he was not required to meet this third factor at all, and that the factors laid out in <u>Luisi</u>, 482 F.3d at 55, are merely factors for the district court to weigh in assessing a defendant's derivative entrapment theory. We need not address an argument raised for the first time in a party's reply brief. <u>See</u> <u>N. Am. Specialty Ins. Co.</u> v. <u>Lapalme</u>, 258 F.3d 35, 45 (1st Cir. 2001) ("[A]bsent exceptional circumstances, an appellant cannot raise an argument for the first time in a reply brief."). Nor would it make any difference here because Salinas-Acevedo is incorrect. All five <u>Luisi</u> factors must be met in order to warrant an entrapment instruction based on the conduct of a middleman. <u>See</u> <u>Luisi</u>, 482 F.3d at 55; <u>see also</u> <u>United States</u> v. <u>Navedo-Ramirez</u>, 781 F.3d 563, 570 n.1 (1st Cir. 2015) (describing the <u>Luisi</u> factors as "conditions" that must be "satisfied").

its agent (Camacho) had "told" or "instructed" the middleman (Rullán-Santiago or Méndez-Pérez) to apply the inducement later deemed improper. See United States v. Rogers, 102 F.3d 641, 645 (1st Cir. 1996) ("Under the case law the government would be responsible if [its agent] told [the middleman] to apply the pressure or inducement later deemed improper, and perhaps if [the government's agent] knowingly tolerated it, but not if [the government's agent] were ignorant of it."); Luisi, 482 F.3d at 55.

For example, in Rogers, a government agent was introduced to a third-party middleman who engaged the defendant in a conspiracy to purchase drugs with the intent to sell. The defendant argued that the middleman should be treated as an "unwitting government agent." Rogers, 102 F.3d at 645. We disagreed, finding that there was insufficient evidence associating the government's agent with any improper inducement by the middleman. Id. We specifically noted that even if the middleman did act improperly, nothing in the record demonstrated that the government agent "urged, suggested, or was even aware of" the improper conduct referenced by the defendant. Id.

Similarly, here, the record negates a finding of improper inducement by the government itself (via its agent, Camacho). On multiple occasions, Camacho told his intermediaries not to pressure Salinas-Acevedo to participate in the drug deals. While Camacho repeatedly asked the middlemen to check on Salinas-

Acevedo's availability and willingness to participate, there is no evidence that he urged them to apply improper pressure on Salinas-Acevedo to join the enterprise. To the contrary, Camacho specifically directed Méndez-Pérez that "if [Salinas-Acevedo] gives you a lot of crap[;] . . . [t]his isn't compulsory, this is for those who want to and know what it is."

And although Camacho did direct Rullán-Santiago to get Salinas-Acevedo ("that guy that you tried to find last time") to participate and Rullán-Santiago responded that he would see "if that dog is around here," Camacho never insisted that Rullán-Santiago do whatever it takes to get Salinas-Acevedo to participate. Instead, Camacho's reply -- "don't do the same shitty thing to me like you did last week" -- appears to be a warning about adequate notice, given that Rullán-Santiago had backed out of the first transaction at the last minute and Camacho wanted Rullán-Santiago to let him know "for sure" -- one way or another -- whether Salinas-Acevedo would participate. Salinas-Acevedo must show not only that Camacho, through his middlemen, gave him the opportunity to commit the crime, but also a "plus" factor -- an inducement amounting to some kind of "government overreach." Guevara, 706 F.3d at 46. Even if we were to assume that actions of the middlemen here were improper, Salinas-Acevedo has failed to

produce sufficient evidence of <u>government</u> overreach or arm-twisting in this case.[10]

Salinas-Acevedo has thus failed to meet the improper inducement prong of his two-prong burden, and we need not proceed to the second question of whether he was already predisposed to commit the crime. The district court did not err in denying Salinas-Acevedo an opportunity to present an entrapment defense.

### III. SANTIAGO-CORDERO

The last of the three defendants in this appeal, Santiago-Cordero, participated in an Operation Guard Shack drug deal on July 8, 2010, and was tried for one count each of conspiracy

---

[10] We do not consider Salinas-Acevedo's originally-proffered claim that Rullán-Santiago duped him into participating in the March 24 deal by misrepresenting it as a legitimate business transaction over the sale of diamonds. Salinas-Acevedo conceded below that he had no proof that it was Camacho who directed or in any way encouraged Rullán-Santiago to tell him this lie. <u>See</u> <u>United States</u> v. <u>Gates</u>, 709 F.3d 58, 63 (1st Cir. 2013) ("[A] party cannot concede an issue in the district court and later, on appeal, attempt to repudiate that concession and resurrect the issue. To hold otherwise would be to allow a litigant to lead a trial court down a primrose path and later, on appeal, profit from the invited error."). Because Salinas-Acevedo has no evidence connecting the purported misrepresentation to a government agent, it does not factor into our derivative entrapment analysis.

Although Salinas-Acevedo was not permitted to argue that he was lied to as part of an entrapment defense, we note that he did have an opportunity to do so at trial as part of his argument that he lacked the mens rea to commit the crime. The jury was thus presented evidence of the alleged misrepresentation -- including the phone conversation in which Rullán-Santiago told Camacho that Salinas-Acevedo would "jump off the balcony" upon seeing the drugs -- and had the opportunity to consider it in coming to its verdict.

to distribute and attempted possession with the intent to distribute more than 5 kilograms of cocaine, as well as possession of a firearm in furtherance of a drug crime. The jury found Santiago-Cordero guilty of the conspiracy and firearm counts, but did not reach a verdict as to the attempted possession count. For his crimes, Santiago-Cordero was sentenced to 15-years and 1-month imprisonment.

Santiago-Cordero raises two issues on appeal. First, like Salinas-Acevedo, he appeals the district court's ruling denying him a jury instruction on an entrapment defense. Second, he appeals the district court's denial of his motion for acquittal. We start again with what happened below.

## A. Background

This has, by now, become a familiar scene with a familiar cast of characters, so we will do our best to keep our narration short. Camacho and Rullán-Santiago reprise the same roles here that they played in Salinas-Acevedo's story, as confidential FBI informant and unsuspecting middleman turned co-defendant, respectively.

As he had done with Salinas-Acevedo, Rullán-Santiago (with Camacho's blessing) recruited Santiago-Cordero for an Operation Guard Shack drug deal. Camacho was apparently aware in the lead-up to the deal that Santiago-Cordero was money-strapped, because during the phone calls in which they discussed bringing

Santiago-Cordero on board, Rullán-Santiago told Camacho that Santiago-Cordero was in need of money.

On July 8, 2010, as planned, Santiago-Cordero arrived with firearm in tow at the apartment where the sham drug deal would take place. Unaware that he was being surveilled by the FBI, Santiago-Cordero provided security services at the deal, where undercover officers posing as drug dealers exchanged sham cocaine bricks for large amounts of cash. After the deal was completed, Santiago-Cordero was paid $2,000. This was all caught on film.

Santiago-Cordero was arrested shortly thereafter, charged, and stood trial along with Rivera-Ruperto and Salinas-Acevedo. During trial, the prosecution introduced testimony from Camacho, as well as the video footage of the deal.

Toward trial's end, the court held a jury charge conference. There, counsel for Santiago-Cordero requested that the jury be instructed on an entrapment defense, which the judge denied. After deliberations, the jury found Santiago-Cordero guilty of the conspiracy and firearm counts, but did not reach a verdict as to the attempted possession count.

About a week after trial, Santiago-Cordero filed a motion for acquittal, in which he argued that his conviction should be vacated because the evidence had been insufficient to support the jury's verdict on the conspiracy count. The judge denied the motion, and, after a sentencing hearing, sentenced Santiago-

Cordero to 15-years and 1-month imprisonment. Santiago-Cordero now appeals both the sufficiency of the evidence and jury instruction issues.

**B.    Analysis**

### 1.    Sufficiency of the Evidence

Santiago-Cordero argues, as he did in his motion for acquittal below, that both his convictions should be overturned because: (1) the government presented inadequate evidence at trial to support a guilty verdict on the conspiracy charge, and (2) without the conspiracy conviction, there was no "drug crime" on which his conviction for possession of a firearm in furtherance of a drug crime could be based. Because Santiago-Cordero preserved his sufficiency of the evidence argument, we apply de novo review. See United States v. Adorno-Molina, 774 F.3d 116, 121 (1st Cir. 2014).

In order to return a conspiracy conviction under 21 U.S.C. § 846, the government must show that: "(1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy." United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013). Here, Santiago-Cordero takes issue with the "knowledge" element, arguing that at trial the government presented insufficient evidence that he knew the transaction involved the distribution of drugs. He contends that the video footage shows

that drugs were never explicitly discussed during the transaction, and that he never looked inside the wrapped packages to confirm that they, in fact, contained drugs. He also argues that Camacho testified at trial that he did not know what Santiago-Cordero had been told about the transaction by Rullán-Santiago, and the government never put Rullán-Santiago himself on the stand. Thus, he claims, the government's evidence was insufficient to prove beyond a reasonable doubt that he had knowledge of the nature of the conspiracy.

But a jury verdict will not be overturned so long as we find that a rational factfinder could have found that the evidence presented at trial, "together with all reasonable inferences, viewed in the light most favorable to the government," established each element of the offense beyond a reasonable doubt. United States v. Poulin, 631 F.3d 17, 22 (1st Cir. 2011). Given this difficult standard, defendants raising this claim are "rarely successful," United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993), and Santiago-Cordero is no exception.

To sustain a conspiracy conviction under § 846, the government "need only prove that the defendant had knowledge that he was dealing with a controlled substance, not that he had knowledge of the specific controlled substance." United States v. Woods, 210 F.3d 70, 77 (1st Cir. 2000). Here, the government introduced at trial video footage of Santiago-Cordero, who the

- 34 -

jury knew was a trained police officer, showing up for the July 8 deal armed with his firearm and ready to provide security.

Santiago-Cordero frisked the undercover buyer upon arrival at the deal site, and then watched as a substance packaged in bricks and marked with logos (in the same manner as cocaine is usually packaged) was exchanged for cash.  See United States v. Azubike, 564 F.3d 59, 65 (1st Cir. 2009) (explaining that where the jury was shown evidence that "the modus operandi of the crime was the same as that of drug transactions sadly common in this geographic area," this "support[ed] the jury's conclusion that defendant knew he was transporting drugs").  Santiago-Cordero was then paid $2,000 for what amounted to less than an hour of work.

The government also presented the jury with a recorded phone call in which Rullán-Santiago told Camacho that he had informed Santiago-Cordero that they would be working a drug deal, as well as footage from the July 8 deal in which Camacho asks Santiago-Cordero, "Rullán already explained it to you?," and Santiago-Cordero answers in the affirmative.  On this evidence, a jury had a more than adequate basis to come to its conclusion that Santiago-Cordero had knowledge of the nature of the conspiracy. We thus affirm.

### 2.   Entrapment Defense

We turn to Santiago-Cordero's appeal of the judge's denial of an entrapment defense instruction.  Because he raised

the objection below, our review is de novo.  See Azubike, 564 F.3d at 64.

Having already mapped out the doctrine of derivative entrapment in our previous discussion of Salinas-Acevedo's appeal, we keep our discussion of Santiago-Cordero's entrapment argument short.  Recall that a defendant is only entitled to an entrapment defense if he can establish the government agents improperly induced a crime that he was not already predisposed to commit. Sánchez-Berríos, 424 F.3d at 76-77.  Here, the only evidence that Santiago-Cordero has produced of improper inducement is that the government knew he was "broke and needed money," and that the government knew that its middleman, Rullán-Santiago, was a "delinquent" and used him anyway to recruit Salinas-Acevedo.

Awareness on the part of the government of a targeted defendant's difficult financial situation does not, without more, constitute improper inducement.  See, e.g., United States v. Baltas, 236 F.3d 27, 37 (1st Cir. 2001). As for Santiago-Cordero's suggestion that using Rullán-Santiago as a middleman despite his shady reputation somehow constituted improper inducement, this misses the mark, too.  As we explained above, the focus in an improper inducement inquiry is on the government's tactics for recruiting the defendant.  Rullán-Santiago may have been of disreputable character, but Santiago-Cordero has not identified any specific conduct on Rullán-Santiago's part, whether at

- 36 -

Camacho's behest or otherwise, that constitutes improper inducement. Thus, Santiago-Cordero did not meet his burden of production on an entrapment defense, and was not entitled to an instruction at trial.

## CONCLUSION

For the reasons we have stated above, we affirm.


**-Dissenting Opinion Follows-**

**TORRUELLA**, <u>Circuit Judge</u> (Dissenting in Part).  The majority holds that, as a matter of law, repeated suggestions cannot give rise to a defense of entrapment.  I respectfully dissent.  The purpose of sting operations is to bring willing perpetrators to justice, not to induce law-abiding citizens to err.  Repeated suggestions are precisely one way to induce law-abiding citizens to err -- especially where, as here, those law-abiding citizens are in dire financial straits.

Because the majority has already laid out the facts of this case, I summarize only the key facts here.  Salinas-Acevedo was in debt, had a little daughter, and another child on the way -- his financial situation was difficult, to say the very least.  Both the government agent and the middlemen knew this.  Still, Salinas-Acevedo showed great reluctance to become involved in any illegal drug transaction.  The middleman had to approach Salinas-Acevedo multiple times in order to induce him to participate in the drug transaction. Although Salinas-Acevedo initially agreed, he later pulled out of the transaction on account of his little girl.  It was only after being approached by the middleman again that Salinas-Acevedo finally gave in and reluctantly participated in the drug transaction.  The middleman's actions were all on the direct instructions of the government agent.  Indeed, the final instructions of the government agent to the middleman were "Hey,

-- 38 --

get that guy," "find, find that guy," and, once more, "[f]ind that guy" -- all referring to Salinas-Acevedo.

I agree with the majority that we are here faced with derivative entrapment, and that the test for that has five prongs:

> (1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

United States v. Luisi, 482 F.3d 43, 55 (1st Cir. 2007).

I also agree with the majority that the first two prongs of this test are satisfied -- but unlike the majority, I believe that the third prong is satisfied as well.[11]

The majority takes great comfort in the fact that "[u]nder the case law the government would be responsible if [its agent] told [the middleman] to apply the pressure or inducement

---

[11] Because the majority does not believe that the third prong is satisfied here, it does not reach the fourth and fifth ones. For the same reason, the majority also does not reach the improper inducement prong of the entrapment analysis. On the facts of this case, I have no difficulty finding that all these prongs have been met.

later deemed improper, and perhaps if [the government agent] knowingly tolerated it, but not if [the government agent] were ignorant of it."  United States v. Rogers, 102 F.3d 641, 645 (1st Cir. 1996).  The majority then reasons that there are no indications that the government agent engaged in any improper inducement; the majority emphasizes that even if the middleman somehow did engage in improper inducement, then there is no indication that the government agent had told the middleman to do so.

However, "examples of improper 'inducement'" include the use of "'repeated suggestions' which succeeded only when the defendant had lost his job and needed money for his family's food and rent."  United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994)(Breyer, C.J.)(quoting United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir. 1993)).  In the present case, the government agent told the middleman to engage in exactly this kind of improper inducement, for the government agent told the middleman to approach Salinas-Acevedo repeatedly about the drug transaction, knowing full well that Salinas-Acevedo had serious difficulties providing for his family, and that he had declined to participate numerous times.[12]

---

[12]  Another example of improper inducement is "dogged insistence until [defendant] capitulated".  Gendron, 18 F.3d at 961 (quoting United States v. Rodriquez, 858 F.2d 809, 815 (1st Cir. 1988)(alteration in original); see also United States v.

Other circuits have also found that repeated suggestions constitute improper inducement for entrapment purposes. See United States v. Mayfield, 771 F.3d 417, 435 (7th Cir. 2014)(en banc)(holding that improper inducement "may be repeated attempts at persuasion"); United States v. Kessee, 992 F.2d 1001, 1004 (9th Cir. 1993)("[The government agent] induced [the defendant] to sell narcotics by repeated entreaties, which only became successful when [the defendant] had lost both his jobs and desperately needed the money . . . A jury could have had a reasonable doubt as to inducement or lack of predisposition"); United States v. Burkley, 591 F.2d 903, 915 (D.C. Cir. 1978) ("[T]he trial judge correctly issued an entrapment instruction because (1) [the government agent]'s repeated requests constituted sufficient evidence of inducement").

It is not surprising that our sister circuits have come out this way, because the Supreme Court has found entrapment (even as a matter of law) where repeated suggestions were involved.

Retracing the Supreme Court's key entrapment cases may help illuminate the problem . . .

Montoya, No. 15-2089, 2016 WL 7336577, at *2 (1st Cir. Dec. 19, 2016) ("[Improper inducement] might include, for example, . . . relentless insistence . . . to participate in a criminal scheme). In the present case, I have no difficulty finding that the government agent told the middleman to engage in "dogged insistence" or "relentless insistence." This dissent focuses on "repeated suggestions" in light of defendant's difficult financial situation, because the facts of this case shout out "repeated suggestions" even more loudly than they do "dogged insistence" and "persistent insistence."

> In Sorrells the Court found that an entrapment instruction was warranted . . . the informant's persistent appeal to military camaraderie qualified as a potentially entrapping inducement. [Sorrells v. United States, 287 U.S. 435, 441 (1932).] In Sherman the Court found entrapment as a matter of law . . . the inducement there consisted of repeated requests from an informant posing as a fellow recovering addict who had fallen off the wagon. [Sherman v. United States, 356 U.S. 369, 371 (1958).] In Jacobson the Court found entrapment as a matter of law . . . the inducement in that case was a two-year campaign of fake mail-order entreaties conditioning the defendant to believe that child porn was acceptable and encouraging him to purchase it. [Jacobson v. United States, 503 U.S. 540, 546-47 (1992).]
>
> . . . [In each of these cases] [t]he entrapment defense was available because the government's solicitation of the crime was accompanied by subtle and persistent artifices and devices that created a risk that an otherwise law-abiding person would take the bait.

Mayfield, 771 F.3d at 434 (emphasis added).

In sting operations, the Government should know when to take "no" for an answer, lest, as here, the "Government's quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." Gendron, 18 F.3d at 961 (quoting Jacobson, 503 U.S. at 553-54)(emphasis added in original).

I respectfully dissent.