# United States Court of Appeals
## For the First Circuit

No. 13-2072

UNITED STATES OF AMERICA,

Appellee,

v.

DAVIEL SALINAS-ACEVEDO,

Defendant, Appellant.

Before

Torruella, Lipez, and Thompson,
<u>Circuit Judges</u>.

**ORDER OF COURT**
**Entered: July 11, 2017**

Daviel Salinas-Acevedo ("Salinas-Acevedo") has filed a petition for a rehearing or rehearing en banc alleging "the panel decision conflicts with a decision . . . of the court to which the petition is addressed." Fed. R. App. P. 35(b)(1)(A). Salinas-Acevedo asserts that the panel's January 13, 2017 decision, affirming the district court's refusal to permit him to make an entrapment defense, conflicts with our prior holding in <u>United States</u> v. <u>Gendron</u>, where we noted that "[c]ourts have found a basis for sending the entrapment issue to the jury . . . where government officials . . . used 'repeated suggestions' which succeeded only when defendant had lost his job and needed money for his family's food and rent." 18 F.3d 955, 961 (1st Cir. 1994) (quoting <u>United States</u> v. <u>Kessee</u>, 992 F.2d 1001, 1003 (9th Cir. 1993)). Because our January 13, 2017 decision does not conflict with <u>Gendron</u>, but instead finds the facts of this case distinguishable such that an entrapment instruction was not necessary, Salinas-Acevedo's petition for panel rehearing is denied.

In our ruling rejecting Salinas-Acevedo's argument that he was entitled to an entrapment defense, we first assumed that Salinas-Acevedo properly preserved his entrapment arguments, affording him the benefit of de novo review. We noted that a defendant seeking to present an entrapment defense at trial must demonstrate (1) improper inducement and (2) that he was not already predisposed to commit the crime. <u>See</u> <u>United States</u> v. <u>Sánchez-Berríos</u>, 424 F.3d 76 (1st Cir. 2005). Salinas-Acevedo's argument relied on a derivative theory of entrapment, where a middleman's actions can be attributable to the government if:

(1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

United States v. Luisi, 482 F.3d 43, 55 (1st Cir. 2007).

We noted that while Salinas-Acevedo met elements (1) and (2), he failed to meet his burden with regard to element (3) -- namely, demonstrating that the government agent (Camacho) requested, encouraged, or instructed a middleman (Rullán-Santiago or Méndez-Perez) to employ a specified improper inducement. Although Salinas-Acevedo was presented with repeated opportunities to engage in the illegal activity and it is undisputed that he was facing difficult financial times, we found Camacho's specific instructions not to pressure Salinas-Acevedo, along with other facts in this case, to be sufficient evidence that Camacho did not instruct the middlemen to engage in improper inducement.

In denying Salinas-Acevedo's petition for rehearing, we take this moment to further clarify our holding in this case. "Inducement requires not only giving the defendant the opportunity to commit the crime but also a 'plus' factor of government overreaching." United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015) (quoting United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013)). In González-Pérez, 778 F.3d at 12, another Operation Guard Shack defendant similarly claimed, as Salinas-Acevedo does here, that he had been targeted because of his difficult financial situation and had been repeatedly solicited despite his initial resistance. There, we held that the circumstances did not amount to improper government inducement because the government had employed "no arm-twisting or undue coercive method." Id. Additionally, we held that the defendant's circumstances in that case -- he "had various part-time jobs . . . and . . . thought that the high payment offered by [the government agent] would help him solve his financial situation" -- was not enough to constitute inducement. Id. Here, we hold that Salinas-Acevedo has similarly failed to produce any evidence of government overreach or arm-twisting.

Indeed, the record indicates and the parties assert that Salinas-Acevedo was solicited, at most, a total of three times.[1] The first time took place at some point before March 9, 2010. During a call on March 9, 2010, Rullán-Santiago informed Camacho that at the last minute Salinas-Acevedo had decided not to participate in a sham drug deal. Rullán-Santiago told Camacho that

---

[1] The dissent argues that it is "misleading" to say that there were only three solicitation requests. The dissent would have us speculate as to an infinite number of requests. However, we rely on the record as well as the parties' representations and decline to speculate where the record is silent.

Salinas-Acevedo had cited his daughter as the reason he could not participate. Rullán-Santiago also informed Camacho that in response to Salinas-Acevedo's decision not to participate, Rullán-Santiago had told Salinas-Acevedo "[l]ook, [sic] is all right, bro" and to "[f]orget it, cool. That's cool."

The second time that a middleman solicited Salinas-Acevedo to take part in the sham drug deals presumably occurred after another recorded call. In that call Camacho spoke with Méndez-Perez, brought up Salinas-Acevedo, and asked Méndez-Perez what he thought of Salinas-Acevedo. The call is somewhat confusing, but ends with Camacho asking Méndez-Perez to talk to Salinas-Acevedo, and Méndez-Perez indicating that he would go to Salinas-Acevedo's home to talk to him. Camacho specifically instructed Mendez-Perez not to pressure Salinas-Acevedo, stating that "if he gives you a lot of crap . . . [t]his isn't compulsory, this is for those who want to and know what it is."[2]

The last indication in the record of Camacho instructing a middleman to recruit Salinas-Acevedo occurred sometime after March 19, 2010. During a call on that date, Camacho offers Rullán-Santiago an opportunity to work another sham drug deal. Rullán-Santiago jumps at the opportunity and Camacho asks him to "get that guy that you tried to find last time." Rullán-Santiago responded that he would see if Salinas-Acevedo was available, stating "[o]kay, let me see if, if that dog is around here." Camacho then tells Rullán-Santiago to let him know for sure whether Salinas-Acevedo would participate because he did not want him to "do the same shitty thing to me like you did last week" -- when Salinas-Acevedo decided not to participate at the last minute.

Given these facts, we find the three requests here, over approximately a ten-day period, do not amount to improper coercion or inducement by the government. Although Salinas-Acevedo was facing financial difficulties with the impending arrival of a second child, financial distress alone does not render the repeated presentation of an opportunity to commit a crime improper. See United States v. Baltas, 236 F.3d 27, 36 (1st Cir. 2001) ("Improper inducement goes beyond providing an ordinary opportunity to commit a crime. An inducement consists of an 'opportunity' plus something else -- typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." (citations omitted)). And while we noted in Gendron, 18 F.3d at 961, that repeated suggestions in light of a defendant's financial straits may merit an entrapment instruction, the facts of this case are distinguishable.

Unlike the defendant in Kessee, Salinas-Acevedo at no time faced any sudden change in means and therefore did not suffer from any increased vulnerability that would make the government's later repeated offers to participate more objectionable. See Kessee, 992 F.2d at 1004 (noting that the "repeated entreaties . . . only became successful when Kessee had lost both his jobs" and "did not know where he would get the money for rent and food for his family").

---

[2] As noted in our original opinion, Méndez-Perez may have never followed through on his plans to recruit Salinas-Acevedo as indicated during this call. See United States v. Rivera-Ruperto, 846 F.3d 417, 429 n.8 (1st Cir. 2017). We, however, assume arguendo that this solicitation actually took place although the record is silent as to what was actually asked of or said to Salinas-Acevedo.

Moreover, the government agent here expressly instructed at least one middleman (Méndez-Perez) not to pressure Salinas-Acevedo. And although the second middleman (Rullán-Santiago) was never given such direct instructions, during the March 19, 2010 call when Camacho suggested that Rullán-Santiago "get that guy that you tried to find last time" (in reference to Salinas-Acevedo), Camacho also made clear that he simply wanted Rullán-Santiago to bring an associate to participate in the deal -- not necessarily Salinas-Acevedo, but someone.

Indeed, Rullán-Santiago understood that if Salinas-Acevedo declined to participate and he could not get someone else to join, they might postpone the deal. Camacho even made a specific suggestion that Rullán-Santiago could seek out an alternative participant (if Salinas-Acevedo was not available), such as another individual "from Maricao, I don't know, the one you had told me about." Thus, Camacho never instructed Rullán-Santiago to employ inappropriate means to recruit Salinas-Acevedo, but merely instructed him to provide Salinas-Acevedo with an opportunity -- Salinas-Acevedo was free to decline and Camacho was only interested in Rullán-Santiago recruiting a second corrupt officer to participate. Indeed, this lines up with the overall design of the sting operation to "hire" corrupt law enforcement officers to provide armed security at the staged drug deals, and then have those officers recruit others to participate in subsequent deals, thereby unwittingly assisting the sting in ferreting out additional corrupt officers. The dissent seems to find it important that Camacho never gave Rullán-Santiago explicit instructions not to pressure Salinas-Acevedo (like those given to Méndez-Perez); however, the absence of such an instruction does not establish that the government instructed Rullán-Santiago to employ a specific improper method of inducement. And Rullán-Santiago was explicitly instructed only to recruit another corrupt cop, be it Salinas-Acevedo or some other officer. In sum, merely providing the opportunity to commit a crime, even if repeatedly, does not by itself rise to the level of improper government overreach. See Baltas, 236 F.3d at 37. We find that there is no evidence of an improper attempt to persuade Salinas-Acevedo to participate and that the government merely presented Salinas-Acevedo with an opportunity to commit a crime.

Although we believe the dissent takes several creative liberties in its reading of the record, drawing conclusions and inferences which are, in our view, unfounded, we briefly address a few of its concerns.[3] As mentioned by the dissent, we are well aware that Salinas-Acevedo only has to present sufficient evidence that if believed by a rational juror would create a reasonable doubt that he committed the crime of his own accord. And as mentioned above, such a showing requires

---

[3] The dissent misleadingly contends that the majority makes several "concessions," which we do not make. Our January 13, 2017 opinion does note that Salinas-Acevedo "backed out" of the first transaction at the last minute. We still believe this to be true and supported by the record. However, we acknowledge that the record does not provide any affirmative evidence of Salinas-Acevedo's initial agreement to participate after the first request. The record indicates, however, that Salinas-Acevedo intended to participate in the first transaction until he realized that his daughter's daycare was closed on the Wednesday when the first transaction was scheduled and he had no one to watch her ("[Salinas-Acevedo is] the one who takes care of [his daughter]" and on that Wednesday when the initial transaction was scheduled, the daycare for Salinas-Acevedo's daughter was closed -- "they had no classes. There was no school [UI] and [Salinas-Acevedo] couldn't [participate]"). Additionally, Salinas-Acevedo informed Rullán-Santiago that he would not participate in the first transaction the day before the transaction was scheduled.

some evidence of improper inducement by the government. Unlike the dissent, we find that no such evidence exists here.

While we ultimately disagree with the dissent, we note the importance of the issue before us. On the one hand, we do not want to support a position, like the dissent's, where all a defendant would have to show in order to be entitled to an entrapment defense is financial struggles and repeated asks by the government. On the other hand, we also do not want to affirm a standard so stringent that a defendant must essentially prove improper inducement beyond a reasonable doubt in order to be afforded an entrapment jury instruction. While mindful of these competing concerns, here, we struggle to find any evidence of improper government inducement. The mere fact that Salinas-Acevedo had some level of financial difficulty and was asked on more than one occasion if he wanted to participate in the sham drug deals without more is insufficient -- there must be a "plus factor" of government overreach.[4] The record provides no information regarding the specifics of Salinas-Acevedo's financial situation beyond the fact that he was concerned about providing for his family with the arrival of his second child. But the record does indicate that Salinas-Acevedo was employed as a police officer. And while Salinas-Acevedo may have felt internal pressures to participate in the drug deals for money, there is no evidence in the record of improper attempts by the government to exploit that fact or improperly induce him to participate.

To be clear, we are not holding that repeated entreaties on any defendant, regardless of the facts, would be permissible and insufficient to merit an entrapment defense. We merely hold that where, as here, we have a defendant who declines to participate in illegal activity at the last minute, but later decides to commit the offensive act without any evidence that he eventually succumbed to governmental pressures due to changed financial means, the presentation of multiple opportunities to commit the crime without more is insufficient to amount to improper government

---

[4] The "plus" factors identified by the dissent appear to be an assertion that Rullán-Santiago possessed some form of "contempt" for Salinas-Acevedo because he referred to him as a "dog" and the dissent's insistence that there were "multiple, persistent requests by Rullán-Santiago." The record simply does not bear these facts out. First, the inferential leap that Rullán-Santiago possessed some sort of "contempt" or was out to get Salinas-Acevedo specifically is speculative at best and contradicted by the record. Rullán-Santiago used foul language constantly when referencing individuals or circumstances. For instance, in one conversation, Rullán-Santiago referred to various individuals as "cunt," "motherfucker," "liar," and "dick." The fact that Rullán-Santiago, an often foul-talking individual, also referred to Salinas-Acevedo as "cabrón" or "dog" or "cuckold" as detailed by the dissent does not demonstrate that Rullán-Santiago possessed some overarching contempt driving him to persistently pursue Salinas-Acevedo. Second, even the dissent concedes that the "transcripts do not reveal, however, how many times the middlemen requested Salinas's participation." Thus, the dissent's contention that a jury could conclude that "multiple, persistent requests by Rullán-Santiago finally broke Salinas's resistance" is unsupported by the record -- there is no evidence beyond the three calls referenced above of requests being made to Salinas-Acevedo. Moreover, and perhaps most importantly, even if the dissent's take on the facts and record were true and well-supported, none of these facts demonstrate government overreach -- the government agent (Camacho) never instructed either middleman to employ a specific improper tactic. And merely instructing a middleman to offer Salinas-Acevedo an opportunity to participate is insufficient.

inducement or coercion. The dissent simply disagrees with our reading of the record. This disagreement does not warrant rehearing.

**TORRUELLA**, <u>**Circuit Judge**</u>, **dissenting from denial of panel rehearing**. I cannot agree with the majority's view that the present matter is merely a disagreement about how we read the record, and thus not worthy of rehearing. I believe our disagreement is more fundamental than that. It entails whether we recognize the legitimate role of the jury, or whether we will engage in a usurpation of that role. Our role as presented by the record in this case is to "determine whether the evidence is enough, 'if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his own accord.'" <u>United States</u> v. <u>González-Pérez</u>, 778 F.3d 3, 11 (1st Cir. 2015) (internal citations omitted). However, the majority, while paying lip service to this role, proceeds to invert it: it reasons that because, on the record, it might be true that Salinas was not entrapped, Salinas is therefore not allowed to argue to the jury that he was entrapped. Thus, the majority requires Salinas to prove his defense twice: once to the court, and then once more to the jury. In my view, this is not how things work.

The majority now recognizes that repeated requests can give rise to an entrapment defense, but does not incorporate that understanding into its reasoning at the most crucial point. Thus, the majority believes there is no evidence that Camacho (the government agent) instructed any of the middlemen to use improper means, hence, the majority reasons, an entrapment defense is inappropriate because there was no plus factor. What the majority misses is that the use of repeated requests is <u>itself</u> the kind of improper inducement or plus factor that gives rise to an entrapment defense. <u>United States</u> v. <u>Gendron</u>, 18 F.3d 961 (1st Cir. 1994) ("Some examples of improper 'inducement' may help. Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: . . . used 'repeated suggestions' which succeeded only when defendant had lost his job and needed money for his family's food and rent.") (citing <u>United States</u> v. <u>Kessee</u>, 992 F.2d 1001, 1003 (9th Cir.1993)). As I will explain below, the majority also misapplies <u>Kessee</u> (which found that an entrapment defense was required, and which we cited with approval in <u>Gendron</u> and <u>United States</u> v. <u>González-Pérez</u>, 778 F.3d 3, 11-13 (1st Cir. 2015) (where we found that no entrapment defense was required)).

Before turning to these precedents, however, it is essential to turn to the record and the effects it can have on a rational juror. Let me be clear, however, that I do not argue that the disturbing aspects of the record are the improper inducement that is required for an entrapment defense; the repeated requests are the improper inducement. However, the record underscores that there is more than enough in this case for a rational juror to conclude that there is a reasonable doubt that Salinas would have committed the crime of his own accord. Three aspects of the record deserve particular attention:

1. In its January 13, 2017 decision, the majority claimed that Salinas had agreed to participate in the drug deal after the first request, and then reneged at the last minute. In fact, as the majority now concedes, "the record does not provide any affirmative evidence of Salinas-Acevedo's initial agreement to participate after the first request."
2. The majority claims that there were at most three requests. In fact, the record supports the inference there were more than three requests.

- 6 -

3. In its January 13, 2017 decision, the majority claimed that the government gave both middlemen the instruction not to pressure Salinas. In fact, as the majority now concedes, only Méndez-Pérez received this instruction, whereas Rullán-Santiago -- who finally broke Salinas's resistance -- received no such instruction, but was told to "get that guy" and was given a financial incentive to do so.

As the majority now concedes, there is no evidence Salinas agreed to participate in the drug deal after the first request.[5] The record reveals that Rullán-Santiago (the middleman) informed Camacho (the government agent) that "[Salinas] sort of said it was <u>no</u> good, and <u>no, no, no, no.</u> You know? <u>No.</u>" As a reason for his refusal to participate in the drug deal, Salinas said "[s]orry, it is gonna be difficult for me because of the little girl and the like." At no point in this transcript, or at any other place in the record, does it say that Salinas had ever agreed to participate in the drug deal -- nor does the government even claim this in its brief. Rather, the only evidence is that Salinas repeated "no" at least six times.[6]

It is misleading to say, as the majority does, that there were at most three requests.[7] It is true that the record contains the transcripts of three conversations between the government agent and the two middlemen. Those transcripts do not reveal, however, how many times the middlemen requested Salinas's participation. Especially the second and third transcripts imply that each of the middlemen asked Salinas multiple times to participate in the drug deal. In the second transcript, it is Camacho (the government agent) who brings up the topic of Salinas. Méndez-Pérez (a middleman), who was "buddies with Salinas" and who was fully aware of Salinas's financial troubles, would go to Salinas's house. The government agent instructed this middleman that "if [Salinas] gives you <u>a lot of</u> crap," then the middleman should leave Salinas alone. The government agent did not say "<u>any</u> crap" or "<u>any</u> resistance," or something to that effect -- he said "<u>a lot</u> of crap." That is, the middleman had instructions to keep making requests until he got "a lot of crap." Thus, numerous requests likely occurred until the middleman received the requisite amount of pushback from Salinas. In the third transcript, the government agent simply tells Rullán-Santiago to "get that guy" -- meaning Salinas. When Rullán-Santiago asks whether he has to bring someone to the drug deal, the agent replies "What? Of course," and then tells the middleman to "[f]ind that

---

[5] The majority finds that the record indicates this. First, the question before us is whether a rational juror could find for Salinas, not whether a rational juror could find against him. Suggestions in the record that favor Salinas are therefore appropriate; suggestions that go against him are inapposite. In any event, the suggestions the majority relies on is a reference to his daughter being in daycare and him taking care of her made some two weeks after he declined to participate in the first drug deal. Note also that the middleman did not believe the explanation.

[6] The majority appears to emphasize that Salinas refused to participate in the transaction <u>at the last minute</u>. It is unclear what the significance of this timing is for the present case -- Salinas refused when he was approached by Rullán-Santiago, and it was thus Rullán-Santiago who chose the timing. In any event, the record only shows that <u>Rullán-Santiago</u> informed Camacho on Tuesday morning of Salinas's refusal to participate in the Wednesday transaction. The record is silent as to when Salinas in fact refused to participate.

[7] The majority claims -- without citing to the record -- that the parties agreed that there were only three requests. The dissent has found no support for this in the record. If anything, Salinas emphasizes the intensity with which his resistance was broken down.

guy."  That is, Rullán-Santiago will not be allowed to participate in the deal -- and thus not be allowed to make money -- unless he succeeds in bringing someone.  Rullán-Santiago, in the meantime, had referred to Salinas as "that dog."[8]  Given such unambiguous instructions "to get" Salinas, given Rullán-Santiago's financial incentive to do so, and given Rullán-Santiago's apparent contempt for Salinas, a rational jury could conclude that multiple, persistent requests by Rullán-Santiago finally broke Salinas's resistance.[9]  Note that while Camacho had instructed Méndez-Pérez to leave Salinas alone if Salinas gave him "a lot of crap," Rullán-Santiago received no similar instruction.  He was never told that this deal was only for those who wanted it.  He was never told not to apply pressure.  But he was told to "get that guy."

The majority here accuses the dissent of speculation.  But the dissent is, in fact, fulfilling the proper role of the court in this situation:

> [i]n order to be entitled to an instruction on entrapment, the record must show "some hard evidence" of both government inducement and the defendant's lack of predisposition.  This evidence must be more than uncorroborated self-serving assertions.  In assessing the sufficiency of this evidence, the district court may not weigh the evidence, make credibility determinations or resolve conflicts in the evidence.  Rather, it must determine <u>whether the evidence is enough, "if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his own accord."</u>

González-Pérez, 778 F.3d at 11 (internal citations omitted) (emphasis added).  The dissent merely shows that Salinas has squarely met his burden of presenting enough evidence to prevail on his entrapment defense in front of a rational jury.  The majority, however, fully ignores what Salinas's burden in fact is, and instead proceeds to do precisely what a court is prohibited from doing here: to resolve conflicts in the evidence.  Thus, the majority notes that, after Camacho told Rullán-Santiago to "get that guy," there was also a brief reference in the conversation to someone "from Maricao" as a potential alternative to Salinas, and promptly concludes that Camacho merely instructed his middleman to provide Salinas with an opportunity.  Even if it were the case that this cursory reference to an alternative target could somehow negate the clear instruction to "get that guy," it is emphatically not the court's role to resolve this conflict in the evidence.

It is precisely the evidence that Salinas has presented that distinguishes the present case from González-Pérez, on which the majority relies.  In González-Pérez, the defendant provided only a "bare assertion that [the confidential informant] called him several times and [the defendant]

---

[8]  In fact, Rullán-Santiago called Salinas a "*cabrón.*"  This Spanish word is far more offensive than the English word "dog," and is more accurately translated as "cuckold."

[9]  The majority does not believe that Rullán-Santiago's use of foul language signifies any contempt for Salinas, because, as the majority details, Rullán-Santiago used foul language frequently.  This only makes it more likely, however, that Rullán-Santiago's requests that Salinas participate in a drug transaction were not polite requests -- but rather ones filled with intimating foul language -- and the fact that the government agent knowingly chose exactly this middleman "to get that guy" does not help the majority's case either.

declined previous invitations to commit offenses . . . ." 778 F.3d at 12.  Indeed, the evidence in González-Pérez showed that the defendant was so "eager to avail himself of the opportunities to commit the crimes that he repeatedly told [a government agent] that he was 'very grateful' and 'at his service,' and exclaimed 'Oh wow! That's awesome, dude,' upon learning of an additional opportunity to provide armed security." Id. at 13.  In addition, González-Pérez "cite[d] no evidence indicating that his financial situation was such that he was at a particularly vulnerable point in his life." Id. at 12.  Salinas, however, has provided hard evidence -- in the form of the transcripts of recorded conversations -- of his several refusals to participate in the drug deal as well as of his desperate financial situation.  There is also no evidence to show that Salinas was eager to participate in this deal -- to the contrary, he was apparently going to "jump off the balcony when he sees [the drugs]."

The present case is not, however, distinguishable from Kessee.  As the majority correctly points out, in Kessee, the "repeated entreaties . . . only became successful when Kessee had lost both his jobs" and "did not know where he would get the money for rent and food for his family." Kessee, 992 F.2d at 1004.  Like the defendant in Kessee, Salinas did not know how to provide for his family now that his wife was pregnant with their second child.  The majority appears to believe that it is important that in Kessee, the defendant refused the requests to participate in a drug deal while he was still employed, but then gave in once he had lost his jobs.  That is, Kessee's resistance ceased once his finances worsened.  Salinas, however, kept resisting even though his finances were desperate.  If anything, Salinas has shown more resistance to committing a crime than Kessee had shown, not less, and is therefore all the more deserving of an entrapment defense.

The majority also appears to suggest that the compressed time period of approximately ten days during which the repeated requests took place works against Salinas.  However, the short intervals between the repeated requests only increase the intensity of the pressure on Salinas, and thus only strengthen his case.  Already in a desperate situation, Salinas was given little respite from the pressure.  First, Rullán-Santiago asked him to participate in the deal; Salinas refused.  Then, Méndez-Pérez came to his home; again, Salinas refused.  Finally, Rullán-Santiago was out "to get" him; Salinas finally gave in.  Still, he appeared to do so reluctantly, afraid of what he was getting himself into; in the words of Rullán-Santiago:  "[Salinas] is going to jump off the balcony when he sees [the drugs]."

This case presents the exact situation that the entrapment defense serves to protect against:

> When the Government's quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Gendron, 18 F.3d at 961 (quoting Jacobson v. United States, 503 U.S. 540, 543 (1992) and adding emphasis).  Salinas has no criminal record, nor was there even the slightest indication that he had ever been engaged in any police corruption.  Rather, he approached Rullán-Santiago to look for a legitimate job in order to support his family.  Rullán-Santiago was at that time moonlighting as the head of security at Comp USA, and Salinas hoped to find a job as a part-time security officer at Comp USA.  He explained his dire situation to Rullán-Santiago.   Rullán-Santiago informed him

that no such jobs were available.  This took place some four months before the sham drug transaction for which Salinas is now in prison.  Salinas never sought to participate in a crime, and, if left alone by the government agent and his middlemen, likely never would have.  The injustice reaped upon Salinas by the decision of this court in foreclosing his presentation of a legitimate claim to an entrapment defense cannot be accepted without my most fervent objection.

I dissent.

By the Court:

/s/ Margaret Carter, Clerk

cc:
Hon. Carmen Consuelo Cerezo
Frances Rios de Moran, Clerk, United States District Court for the District of Puerto Rico
Ignacio Fernandez-De-Lahongrais
Daviel Salinas-Acevedo
Myriam Yvette Fernandez-Gonzalez
Mariana E. Bauza Almonte
Eric Linden Gibson
Juan Carlos Reyes-Ramos
Robert James Heberle